ACCEPTED
12-15-00189-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/16/2015 5:22:49 PM
Pam Estes
CLERK

CAUSE NO. 12-15-00189-CV    ORAL ARGUMENT REQUESTED

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
9/16/2015 5:22:49 PM
PAM ESTES
Clerk

IN THE

COURT OF APPEALS FOR THE

TWELFTH DISTRICT OF TEXAS SITTING IN TYLER, TEXAS

GARRISON NURSING HOME AND REHABILITATION CENTER
AND GARRISON NURSING HOME, INC.,

APPELLANTS,

VS.

LEGATHA DEMINGS,

APPELLEE.

On Appeal from the 145th Judicial District Court
of Nacogdoches, Nacogdoches County, Texas

APPELLANTS GARRISON NURSING HOME AND REHABILITATION
CENTERAND GARRISON NURSING HOME, INC. BRIEF

KENT, ANDERSON, BUSH, FROST & METCALF, P.C.
DAVID W. FROST
1121 E.S.E. LOOP 323, SUITE 200
TYLER, TEXAS 75701
(903) 579-7507
(903) 581-3701 (FAX)

ATTORNEYS FOR APPELLANTS GARRISON NURSING HOME AND REHABILITATION CENTER AND GARRISON NURSING HOME, INC.

# IDENTITY OF PARTIES AND COUNSEL

The following is a complete list of all parties to the trial court's judgment or

order appealed from and the names and addresses of all trial and appellate counsel:

Plaintiffs/Appellee:
Legatha Demings
Trial Counsel and Appellate Counsel:
W. Stephen Shires
Law Office of Stephen Shires, PLLC
123 San Augustine Street
Center, Texas 75935
(936) 598-3052
(936) 598-3031 facsimile
stephen@shireslawfirm.com

Defendant/Appellant:
Garrison Nursing Home and Rehabilitation Center and Garrison Nursing
Home, Inc.
Trial Counsel and Appellate Counsel:
David W. Frost
Kent, Anderson, Bush, Frost & Metcalf, P.C.
1121 E.S.E. Loop 323, Suite 200
Tyler, Texas 75701
(903) 579-7500
(903) 581-3701 Facsimile
dfrost@tyler.net

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

ISSUE PRESENTED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ISSUE PRESENTED (RESTATED). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     In an Alleged Medical Malpractice Case, the Plaintiff Must Provide
        an Expert Report to the Defendant. . . . . . . . . . . . . . . . . . . . . . . . 5

III.    Dr. Miller is not qualified to address causal relationship between
        alleged failure to administer Xarelto and an alleged stroke.. . . . . . . . . . 8

        A.      Qualification to express causation opinions.. . . . . . . . . . . . . . 8

        B.      The causal relationship between the alleged stroke and the alleged
                failure to administer Xarelto is the very matter at issue. . . . . . . 9

        C.      Appellee fails to establish that Dr. Miller is qualified to address
                causation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                1.      Dr. Miller provides no information regarding
                        Xeralto and his experience with Xeralto. . . . . . . . . . . . 10

**IV.**     Keith E. Miller M.D.'s Report is conclusory regarding causation. . . . . 13

      **A.**      An expert report that is conclusory fails to satisfy the statutory requirements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      **B.**      Dr. Miller's causation opinions are impermissibly conclusory. . 14

           **1.**      Opinions that alleged violations of administrative rules caused stroke are conclusory.. . . . . . . . . . . . . . . . . . . . . . . . 14

           **2.**      Opinion that Alleged failure to administer Xarelto caused stroke is conclusory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                **a.**      Dr. Miller provides no more than a "bare assertion" of causation, and he fails to link his conclusions to the facts. . . . . . . . . . . . . . . . . . . . . . . 18

                **b.**      The court cannot infer that, because Xarelto was not given, Ms. Demings suffered a stroke. . . . . . . . . 20

**V.**     *Res Ipsa Loquitur* does not excuse production of expert report.. . . . . . 22

**PRAYER.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**CERTIFICATE OF COMPLIANCE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**CERTIFICATE OF SERVICE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**APPENDICES**

**Order Denying Defendant's Objections to Plaintiff's Supplemental Expert Report and Motion to Dismiss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

**Expert Report of Keith E. Miller, M.D..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

**Tex. Civ. Prac. & Rem. Code Ann. §74.351.** . . . . . . . . . . . . . . . . . . . . . . . C

# INDEX OF AUTHORITIES

**CASES**                                                                          **PAGE**

*Am. Transitional Care Ctrs. of Tex. v. Palacios,*
    46 S.W.3d 873 (Tex.2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 13, 14

*Bogar v. Esparza,*
    257 S.W.3d 354 (Tex. App.–Austin 2008, no pet.). . . . . . . . . . . . . . . 22, 23

*Bowie Mem'l Hosp. v. Wright,*
    79 S.W.3d 48 (Tex. 2002) (per curiam). . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Broders v. Heise,*
    924 S.W.2d 148 (Tex. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Castillo v. August,*
    248 S.W.3d 874 (Tex. App.–El Paso 2008, no pet.). . . . . . . . . . . . . . . . . . 8

*Collini v. Pustejovsky,*
    280 S.W.3d 456 (Tex. App.–Fort Worth 2009, no pet.). . . . . 8, 11, 13, 20

*Conboy v. Lindale Health Care, LLC,*
    2013 WL 4680516 (Tex. App.–Tyler August 29, 2013, no pet.). . . 14, 20

*Downer v. Aquamarine Operators, Inc.,*
    701 S.W.2d 238 (Tex. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Earle v. Ratliff,*
    998 S.W.2d 882 (Tex.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19

*Flores v. Fourth Court of Appeals,*
    777 S.W.2d 38 (Tex.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Garcia v. Marichalar,*
    198 S.W.3d 250 (Tex. App.–San Antonio 2006, no pet.). . . . . . . . . . 22, 23

*Gingrich v. Scarborough*,
     2010 WL 1711067 (Tex. App.–Beaumont April 29, 2010, no pet.).. . . . . 21

*HEB Grocery Co. v. Galloway*,
     2014 WL 2152128 (Tex. App.–Beaumont May 22, 2014, no pet.). 11, 12, 13

*Ibrahim v. Gilbride*, 2010 WL 5064430
     (Tex. App.–Houston [14th Dist.] December 9, 2010, no pet.).. . . . . . 19, 20

*Jelinek v. Casas*,
     328 S.W.3d 526 (Tex. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18, 2

*Shaw v. BMW Healthcare, Inc.*,
     100 S.W.3d 8 (Tex. App.-Tyler 2002, pet. denied). . . . . . . . . . . . . . . . . . 5

*Sherman v. HealthSouth Specialty Hosp. Inc.*,
     397 S.W.3d 869 (Tex. App.–Dallas 2013, pet. denied). . . . . . . . . . . . 22, 23

*Thomas v. Alford*,
     230 S.W.3d 83 (Tex. App.–Houston [14th Dist.] 2008, no pet.). . . . . . . . . 8

**STATUTES**                                                                       **PAGE**

TEX. CIV. PRAC. & REM. CODE §74.201.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

TEX. CIV. PRAC. & REM. CODE §74.351.. . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

TEX. CIV. PRAC. & REM. CODE §74.351 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . 5

TEX. CIV. PRAC. & REM. CODE §74.351 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. CIV. PRAC. & REM. CODE §74.351 (r)(5)(C). . . . . . . . . . . . . . . . . . . . . . 8

TEX. CIV. PRAC. & REM. CODE §74.351 (r)(6). . . . . . . . . . . . . . . . . . . . . . . . . 6

# STATEMENT OF THE CASE

On August 21, 2014, Appellee filed an Original Petition alleging a health care liability claim against Garrison Nursing Home and Rehabilitation Center and Garrison Nursing Home, Inc. (collectively "Garrison"). (CR 5 ). On September 12, 2014, Garrison filed its Original Answer. (CR 19). On January 10, 2015, Appellee filed an expert report and curriculum vitae from Pauline Kaper, R.N., (CR 25). On January 29, 2015, Garrison filed its Objections to Expert Report and Motion to Dismiss. (CR 33). On April 7, 2015, the trial court entered an Order Denying Defendant's Motion to Dismiss and Granting Plaintiff a 30 Day Extension to Cure a Deficient Expert Report having found the report of Pauline Kaper, R.N. deficient. (CR 49). After the Appellee produced a Supplemental Expert report from Keith E. Miller, M.D. on May 5, 2015 (CR 50), Garrison filed its Objections to Plaintiff's Supplemental Expert Report and Motion to Dismiss on May 22, 2015. (CR 78). Appellee filed the Response to Garrison's motion on June 19, 2015. (CR 115). On June 29, 2015, the trial court issued its Order Denying Defendant's Objections to Plaintiff's Supplemental Expert Report and Second Motion to Dismiss. (CR 164). On July 17, 2015, Garrison filed a notice of interlocutory appeal (CR 165).

# ISSUE PRESENTED

(1) Whether the trial court abused its discretion in overruling Garrison's objections to Appellee's supplement expert report from Dr. Keith E. Miller for the failure to show he was qualified to provide opinions regarding the element of causation and denying Garrison's motion to dismiss pursuant to section 74.351 of the Texas Civil Practice and Remedies Code.

(2) Whether the trial court abused it's discretion in overruling Garrison's objections to Appellee's supplemental expert report from Dr. Keith E. Miller for failure to adequately address the element of causation and denying its motion to dismiss those claims pursuant to section 74.351 of the Texas Civil Practice and Remedies Code.

CAUSE NO. 12-15-00189-CV     ORAL ARGUMENT
REQUESTED

IN THE
COURT OF APPEALS FOR THE
TWELFTH DISTRICT OF TEXAS SITTING IN TYLER, TEXAS

GARRISON NURSING HOME AND REHABILITATION CENTER
AND GARRISON NURSING HOME, INC.,

APPELLANT,

VS.

LEGATHA DEMINGS,

APPELLEE.

On Appeal from the 145th Judicial District Court
of Nacogdoches, Nacogdoches County, Texas

APPELLANTS GARRISON NURSING HOME AND REHABILITATION
CENTERAND GARRISON NURSING HOME, INC. BRIEF

COMES NOW, GARRISON NURSING HOME AND

REHABILITATION CENTER AND GARRISON NURSING HOME, INC.,

Appellants in the above-entitled and numbered cause and files the following

Appellants' brief asking the court of appeals to reverse the trial court's ruling on its

- 1 -

motion to dismiss and in support thereof would respectfully show the court the following:

## STATEMENT OF FACTS

This suit involves a health care liability claim related to alleged care and treatment rendered to Legatha Demings by Appellants. The care and treatment at issue occurred between May 25, 2012 and June 8, 2012. (CR 55) On June 8, 2012, Appellee alleges that Ms. Demings suffered a cerebral vascular accident or stroke (collectively "stroke"). (CR 55)

Legatha Demings was born April 28, 1945.[1] Ms. Demings was diagnosed with the condition atrial fibrillation in the Fall of 2010, for which Ms. Demings began taking medication. (CR 64; RR page 5, lines 9-14) One of the risks related to atrial fibrillation is stroke. (RR page 5, lines 13-14).

On May 22, 2012, Ms. Demings suffered a cerebral vascular accident ("CVA") for which she was hospitalized initially in Carthage, Texas, and subsequently at Nacogdoches Medical Center in Nacogdoches, Texas. (CR 55) On May 25, 2012, Ms. Demings was discharged from Nacogdoches Medical Center and transferred to Garrison. (CR 55) One of the discharge medications ordered by Ms. Demings'

---

[1] It is Appellant's understanding that Ms. Demings passed away during the summer of 2015 during the pendency of this lawsuit.

physician was Xarelto, a blood thinning medication. (CR 63)

On June 8, 2012, Ms. Demings was transferred from Garrison back to Nacogdoches Medical Center for evaluation after exhibiting signs of confusion, combativeness and inability to communicate. (CR 55) Appellee alleges that while at Nacogdoches Medical Center Ms. Demings was diagnosed with a stroke. (CR 55) Appellee alleges that Ms. Demings suffered the stroke due to Garrison's alleged failure to administer Xarelto to Ms. Demings. (CR 115) Ms. Demings was hospitalized in Nacogdoches medical Center until June 20, 2012, when she was transferred back to Garrison. (CR 55)

## SUMMARY OF ARGUMENT

This is an appeal of the trial court's review of an expert report. To comply with Chapter 74 of the Texas Civil Practice and Remedies Code, the expert must make a "good faith attempt" to inform the defendants what they did wrong and how that caused damages to the plaintiffs. The expert is required under the case law to apply his conclusions on causation to the underlying facts of the case. In this case, the Appellee relies upon a report authored by Dr. Keith Miller in an effort to comply with causation requirements of Chapter 74.

The trial court abused its discretion in denying Garrison's Motion to Dismiss.

First, Dr. Miller has failed to show that he is qualified to provide opinions regarding the causal relationship between the alleged failure to administer Xarelto and the stroke allegedly suffered by Ms. Demings.

Second, the trial court abused its discretion in denying Garrison's motion to dismiss based on grounds that Dr. Miller's opinion regarding causation is impermissibly conclusory because he fails to provide any explanation whatsoever linking an alleged failure to provide the medication Xarelto to Ms. Demings to the stroke allegedly suffered by Ms. Demings. Since the report fails to satisfy the legal requirements of an expert report, the trial court clearly abused its discretion in denying the motion to dismiss. This court should reverse and render.

## ISSUE PRESENTED (RESTATED)

(1)    **Whether the trial court abused its discretion in overruling Garrison's objections to Appellee's supplement expert report from Dr. Keith E. Miller for the failure to show he was qualified to provide opinions regarding the element of causation and denying Garrison's motion to dismiss pursuant to section 74.351 of the Texas Civil Practice and Remedies Code.**

(2)    **Whether the trial court abused it's discretion in overruling Garrison's objections to Appellee's supplemental expert report from Dr. Keith E. Miller for failure to adequately address the element of causation and denying its motion to dismiss those claims pursuant to section 74.351 of the Texas Civil Practice and Remedies Code.**

# ARGUMENT AND AUTHORITIES

## I. Standard of Review

The standard of review in this case is abuse of discretion. *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 877 (Tex.2001); *Shaw v. BMW Healthcare, Inc.*, 100 S.W.3d 8, 12 (Tex. App.-Tyler 2002, pet. denied). Under an abuse of discretion standard, appellate courts defer to a trial court's factual determinations, but review questions of law de novo. *Shaw*, 100 S.W.3d at 12. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex.1985). When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment. *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41 (Tex.1989). If a trial court fails to apply the law correctly to the case, the trial court has clearly abused its discretion requiring correction by the court of appeals.

## II. In an Alleged Medical Malpractice Case, the Appellees Must Provide an Expert Report to the Defendant.

Chapter 74 of the Texas Civil Practice and Remedies Code states the following:

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a

curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

*See* TEX. CIV. PRAC. & REM. CODE art. §74.351 (a). The statute defines "expert report" as:

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id*. at §74.351 (r) (6).

Therefore, to satisfy the requirements of the statue, a plaintiff in an alleged medical malpractice case must provide an expert report to the defendants. The report must provide a fair summary of the expert's opinions, must set out what the expert alleges the defendant did wrong and how those actions allegedly caused injury to the plaintiffs. In *Wright*, the Supreme Court of Texas stated, "[i]f a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion only if it appears to the court, after

hearing, that the report does not represent a ***good faith effort*** to comply with the definition of an expert report in Subsection (r)(6) of this section." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51-52 (Tex.2002) (per curiam).

The Supreme Court of Texas has defined a "good-faith effort" as one that provides information sufficient to (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Id.* at 52 (citing *Palacios*, 46 S.W.3d at 879). The trial court's review is limited to the four corners of the expert report, which need not "marshal all the plaintiff's proof" but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation. *Id.*

If a report fails to comply with the requirements of chapter 74 of the Texas Civil Practice and Remedies Code, the trial court is required to dismiss the case because of the defendants failure to serve an adequate expert report. Tex. Civ. Prac. & Rem. Code § 74.351 (b). The dismissal also carries mandatory sanctions, requiring an award to the defendant of his costs and attorney's fees against the plaintiff or the plaintiff's attorney. *Id.*; *see Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex.2001).

**III. Dr. Miller is not Qualified to Address Causal Relationship between alleged Failure to administer Xarelto and an alleged stroke**

    **A.    Qualification to express causation opinions**

"A report authored by a person who is not qualified to testify cannot constitute an expert report." *Castillo v. August*, 248 S.W.3d 874, 879 (Tex. App.–El Paso 2008, no pet). A physician is qualified to submit an expert report on the causal relationship between a departure from a standard of care and an injury when he would otherwise be qualified to address causation under rule 702 of the Texas Rules of Evidence. Tex. Civ. Prac. & Rem. Code §74.351 (r)(5)(C). To be so qualified, "an expert must have knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject." *Thomas v. Alford,* 230 S.W.3d 83, 857 (Tex. App.–Houston [14th Dist.] 2007, no pet.). The party offering a witness as an expert on causation must establish that the witness is qualified under rule 702. *Collini v. Pustejovsky*, 280 S.W.3d 456, 466 (Tex. App.– Fort Worth 2009, no pet.). Further, not every licensed doctor is automatically qualified to testify as an expert on every medical question. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). In deciding whether an expert is qualified, the trial court "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Id*. at 151.

Therefore, the focus is on the very matter on which the expert is to give an opinion. *Id*.

**B.** **The causal relationship between the alleged stroke and the alleged failure to administer Xarelto is the very matter at issue**

The Appellee alleges that Ms. Demings suffered a stroke as a result of Garrison allegedly failing to administer Xarelto. While not very explicit in his report, it appears that Dr. Miller is of the opinion that Plaintiff suffered a stroke because Defendant allegedly did not administer to her the medication Xarelto from May 25, 2012 through June 8, 2012. So, the actual subject upon which Dr. Miller is offering an opinion is the relationship between an alleged stroke and the alleged failure to administer the medication Xarelto.

**C.** **Appellee fails to establish that Dr. Miller is qualified to address causation**

Given that Dr. Miller is attempting to offer opinions on the causal connection between the alleged failure to administer Xarelto to Ms. Demings and her alleged stroke, it is Appellee's burden to establish that Dr. Miller truly has expertise as to Xarelto, strokes, and the relationship between Xarelto and strokes. However, Dr. Miller has failed to establish this expertise.

Dr. Miller indicates that he is a medical doctor licensed in Texas with 25 years

experience practicing medicine in office settings, hospitals, nursing homes, rehabilitation centers and emergency departments. (CR 52, 54) He indicates that he is board certified in Family Medicine. (CR 54) He also indicates that he practices in nursing homes similar to Garrison and that he has numerous patients similar to Ms. Demings. (CR 52) Dr. Miller writes

> I am familiar with the diagnosis and treatment of patients with cerebral vascular accidents (strokes), hypertension, related illnesses and their complications, along with any other conditions experienced by Ms. Legatha Demings.

(CR 53)

As set forth below, Dr. Miller does not establish that he is qualified to render an opinion regarding the causal relationship between a stroke and Xarelto.

**1. Dr. Miller provides no information regarding Xarelto and his experience with Xarelto**

Dr. Miller fails to provide any information in his report regarding his familiarity with the drug Xarelto; whether he has ever prescribed Xarelto; or whether he has ever seen a patient suffer a stroke because of the failure to administer Xarelto. In fact, he does not even describe how Xarelto works or its purpose. The lack of such information regarding a physician's experience and familiarity with the medication at issue has led several appellate courts to find an expert unqualified to provide

causation opinions related to other medications.

In *Collini v. Pustejovsky*, the Fort Worth Court of Appeals addressed the qualifications of an expert to express causation opinions regarding negligent administration of a medication. 280 S.W.3d 456, 465 (Tex. App.– Fort Worth 2009, no pet.). In *Collini*, the plaintiff alleged the defendant had negligently prescribed the drug Reglan, which caused her to suffer tardive dyskinesia. *Id*. at 460. In finding the plaintiff's chapter 74 expert unqualified to opine on causation, the *Collini* court wrote that the expert does

> not indicate that he has any specific knowledge, experience, education, or training in assessing the causal relationship between the prolonged use of Reglan and tardive dyskenesia. In fact, his report does not state that he has any experience or training regarding Reglan or tardive dyskinesia at all; rather, it only generally states that he has knowledge applicable to 'primary care and family medicine.'

*Id*. at 465-66.

In *HEB Grocery Co. v. Galloway*, 2014 WL 2152128 (Tex. App.–Beaumont 2014, no pet.), the plaintiff sued the defendant pharmacy for allegedly mixing the wrong medication (an anti-fungal medication, Ketoconaxole) with her blood pressure medication, Coreg. *Id.* at *1. The plaintiff alleged that the mis-filled prescription led to her suffering uncontrolled blood pressure, neurologic symptoms and pain. *Id*. The defendant challenged the qualifications of plaintiff's expert, Jerry Keepers, M.D. *Id*.

The trial court denied the challenge and motion to dismiss. *Id.* On appeal, the Beaumont Court of Appeals found that Dr. Keepers was not qualified to opine that the alleged mistake in the filling of the prescription caused the condition in question. *Id.* at *6. The court noted that Dr. Keepers' report and CV lacked the specific detail necessary to establish he was qualified to render causation opinions. In relevant part, the *Galloway* court noted that Dr. Keepers' report failed to state

> that he has treated patients with high blood pressure or similar conditions; that he has prescribed blood pressure medication to patients or that he has actually prescribed Coreg; that he is familiar with what happens generally to patients who fail to take their blood pressure medications; that he has treated patients with, or read peer-reviewed articles about, and has personal knowledge or experience or training regarding, the side effects and symptoms of failing to take Coreg as prescribed; or that he is familiar with the pharmacology of Coreg and Ketoconaxole.

In the present case, the very matter about which Dr. Miller is attempting to provide opinions is the alleged failure to administer Xarelto causing Ms. Demings to allegedly suffer a stroke. Yet, Dr. Miller provides no information regarding his experience or training with Xarelto. He does not indicate that he has ever prescribed Xarelto; he does not set forth that he is familiar with what happens to patients who do not take Xarelto; and he does not identify any peer-reviewed articles regarding the side effects and symptoms of failing to take Xarelto. This is the very type of

information that was missing from the expert reports in the *Collini* and *Galloway* cases.

Dr. Miller provides no information as to his specific knowledge, experience, education, or training in assessing the causal relationship between the alleged failure to administer Xarelto and a stroke. Dr. Miller fails to provide any information to show that he is qualified to provide opinions on the topic at issue. Therefore, Dr. Miller's report is deficient with regard to showing he is qualified to provide opinions on the causal relationship between the alleged departures from the standard of care and any injury or damage alleged by Appellee.

Because Dr. Miller is not qualified to provide the causation opinions in this case, Garrison filed a motion to dismiss. The trial court clearly abused its discretion in denying the motion to dismiss.

## IV. Keith E. Miller, M.D.'s Report is Conclusory Regarding Causation

### A. An Expert Report That is Conclusory Fails to Satisfy the Statutory Requirements

The Supreme Court of Texas has held that the expert "report cannot merely state the expert's conclusions about [the elements required in an expert report]," but "'the expert must explain the basis of his statements to link his conclusions to the facts.'" *Palacios*, 46 S.W.3d at 877 (Tex.2001) (*quoting Earle v. Ratliff*, 998 S.W.2d

882, 890 (Tex.1999)). "A report that merely states the expert's conclusions about the standard of care, breach, and causation" does not fulfill the two purposes of a good-faith effort." *Palacios*, 46 S.W.3d at 879.

This court has written that

> [a] causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that absent this act or omission, the harm would not have occurred. Merely providing some insight into the plaintiff's claims does not adequately address causation. Accordingly, causation cannot be inferred; it must be clearly stated. The court may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended.

*Conboy v. Lindale Health Care,* LLC, 2013 WL 4680516, *2 (Tex. App.–Tyler 2013, August 29, 2013, no pet.) Further, statements concerning causation cannot be inferred, speculative, or conclusory. *Id.* at *4.

## B. Dr. Miller's Causation Opinions are impermissibly conclusory

Dr. Miller's report addresses causation in a conclusory fashion and is therefore insufficient. He merely asserts that violations of the standard of care caused Ms. Demings to suffer a stroke without providing any medical detail at all on how any alleged violations of the standard of care caused the alleged stroke.

### 1. Opinions that alleged violations of administrative rules caused stroke are conclusory

In his report, Dr. Miller sets forth a dizzying array of administrative rules

- 14 -

which he believes Garrison violated in its care and treatment of Ms. Demings. (CR 59-62) He then, in conclusory fashion, writes that

> [t]he failure to comply with these standards caused, within a reasonable degree of medical and nursing, probability and certainty, Ms. Demings to suffer a stroke, extensive hospitalization, rehabilitation, and related complications, . . . .

(CR 65)

Dr. Miller's causation opinion provides absolutely no link between these alleged violations and the stroke which Plaintiff alleges she suffered. For example, Dr. Miller alleges that Garrison violated

> 2. TAC Chapter 217 Rule 217.11 Standards of Nursing Practice (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall (B) implement measures to promote a safe environment for clients and others.

(CR 60) Dr. Miller simply writes that the violation of this Rule caused Ms. Demings to suffer a stroke. He provides no information at all on the connection of how failing to "implement measures to promote a safe environment for clients and others" was a substantial factor in causing Ms. Demings to suffer a stroke. This example is applicable to all 20 administrative rules which Dr. Miller alleges were violated.

## 2. Opinion that Alleged failure to administer Xarelto caused stroke is conclusory

Appellee has alleged that Ms. Demings suffered a stroke because of the failure to administer Xarelto. Dr. Miller never explicitly states this opinion in his report. However, to the extent Dr. Miller is attempting to provide the opinion that Ms. Demings suffered a stroke because Garrison allegedly did not administer Xarelto to Ms. Demings, this opinion is impermissibly conclusory because Dr. Miller fails to provide any explanation whatsoever on how an alleged failure to provide the medication Xarelto caused Ms. Demings to suffer a stroke.

In *Jelinek v. Casas*, the Texas Supreme Court addressed conclusory reports. 328 S.W.3d 526 (Tex. 2010). In *Jelinek,* the patient was admitted to the hospital with abdominal pain for which she was placed on antibiotics to treat and prevent intra-abdominal infections. *Id*. at 529. Following an intra-abdominal surgery, the hospital inadvertently failed to renew the antibiotics prescriptions resulting in a four-and-a-half day period during which the patient did not receive the antibiotics. *Id*. at 530. The plaintiff filed suit against the hospital and the patient's treating physicians.

The plaintiff produced an expert report alleging that the patient's physicians were negligent in failing to discovery that the antibiotics were not being administered and "in 'reasonable medical probability, resulted in a prolonged hospital course and

increased pain and suffering experienced by Ms. Casas.'" *Id*. at 539. Defendant Dr. Jelinek challenged the expert report and sought a dismissal, but his challenge was overruled by the trial court and affirmed by the appellate court. *Id*. at 531. On appeal to the Texas Supreme Court, Dr. Jelinek argued that the report was deficient because it failed to state the applicable standard of care and because it only provided conclusory statements of causation. *Id*. at 538-39.

The Supreme Court reviewed the report and agreed with Dr. Jelinek with regard to causation. *Id*. The Jelinek Court wrote:

> An expert cannot simply opine that the breach caused the injury. Stated so briefly, the report fails the second *Palacios* element — it does not give the trial court any reasonable basis for concluding that the lawsuit has merit. An expert's conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit*, which we have consistently criticized. . . . Instead, the expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented.

*Id*. at 539 (citations omitted). The court went on to write that the plaintiff's expert report offered

> no more than a **bare assertion** that Dr. Jelinek's breach resulted in increased pain and suffering and a prolonged hospital stay. Beyond that statement, the report offers no explanation of how the breach caused the injury.

*Id*. at 540 (emphasis added). The *Jelinek* Court held the report insufficient because

the report "lacked any explanation linking the experts conclusion to the relevant facts." *Id.*

Therefore, a report that is conclusory and fails to link the expert's opinions on causation to the facts of the case is not a "good faith attempt" and the trial court is required to sustain objections to such a report.

> **a. Dr. Miller provides no more than a "bare assertion" of causation, and he fails to link his conclusions to the facts**

In the present case, Dr. Miller's report is very similar to the report in *Jelinek*. Dr. Miller provides nothing more than the "bare assertion" that failing to meet the standards of care

> within a reasonable degree of medical and nursing, probability and certainty, Ms. Demings to suffer a stroke, extensive hospitalization, rehabilitation, and related complications, . . .

(CR 14)  This is the very *ipse dixit* the *Jelinek* Court held was not permissible.  Dr. Miller is simply stating one event (alleged failure to give Xarelto) caused another (alleged stroke) "without an explanation tying the conclusion to the facts." *Jelinek*, 328 S.W.3d at 539.

Assuming for argument that Ms. Demings did suffer a stroke on June 8, 2012, Dr. Miller provides no explanation as to how the administration of the Xarelto between May 25 and June 8, 2012, would have prevented Ms. Demings' stroke.  Dr.

Miller fails to explain how Xarelto works, the efficacy of Xarelto, his experience with Xarelto, or studies about the effectiveness of Xarelto in preventing strokes, or specific types of strokes. He basically asks the court to believe and agree that Xarelto prevents all strokes. Dr. Miller has not explained the basis of his statements in order to link his conclusions to the facts. *See Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999). He simply opines that Xarelto was not administered and, therefore, Ms. Demings had a stroke. This does not meet the expert requirements for causation.

The issues in this case are also similar to *Ibrahim v. Gilbride*, 2010 WL 5064430 (Tex. App.–Houston [14th Dist.], December 9, 2010, no pet.). In *Ibrahim,* the plaintiff alleged that the defendant had failed to prescribe anti-seizure medications and as a result, the plaintiff suffered a grand mal seizure, struck her head during the seizure causing brain hemorrhages and other sustained injuries. *Id*. at *1. The plaintiff produced an expert report which the defendant challenged as insufficient. With regard to causation, the plaintiff's expert opined that as a direct and proximate result of the defendant failing to prescribe appropriate anti-seizure medications, the plaintiff suffered a grand mal seizure and resulting brain injuries. *Id*. at *10. In finding the report deficient on causation, the *Ibrahim* court wrote the following:

> Dr. Smith fails to identify the seizure disorder suffered by Mrs. Gilbride and its pathology and thus show that medication was a necessary and

potentially effective treatment . . . . Therefore, although "anti-seizure medications" are indubitably intended to prevent seizures. Dr. Smith does not sufficiently inform Dr. Ibrahim and the trial court why such medication would necessarily have prevented Mrs. Gilbride's seizure.

*Id*. at \*11. Similarly, in the present case, Dr. Miller has not identified anything regarding the nature of the alleged stroke which Ms. Demings suffered, or show how the medication Xarelto was necessary and potentially effective treatment. While he identifies Xarelto as a blood thinning medication, Dr. Miller does not provide any information as to why the Xarelto would necessarily have prevented Ms. Demings' alleged stroke.[2] He fails to identify any specifics about the stroke that Ms. Demings allegedly suffered which would have allegedly been prevented by Xarelto.

> **b.     The court cannot infer that, because Xarelto was not given, Ms. Demings suffered a stroke**

A court cannot infer causation. *Conboy*, 2013 WL 4680516 at \*2. Dr. Miller is attempting to have the court infer that had Xarelto been given to Ms. Demings, she would not have suffered a stroke. This is not permitted.

In *Collini*, the court addressed causation inferences. The defendant doctor had challenged the causation opinion of the plaintiff's expert that prolonged use of the medication Reglan had caused tardive dyskinesia. 280 S.W.3d at 467. The *Collini*

---

[2]Appellee's first expert Pauline Kaper, R.N. acknowledges that Ms. Demings suffered a transient ischemic attack ("TIA") while on Xarelto on March 3, 2014. (CR 45)

court agreed with the defendant doctor noting that the expert report did "not provide any detail as to how Reglan caused [the plaintiff's] conditions, or, more importantly, how Dr. Collini's specific prescriptions of Reglan attributed to the harm." The court noted that while the manufacturer's warning regarding prolonged use of Reglan and other causation opinions by doctors "**may create a reasonable inference**" that Dr. Collini's prolonged prescription of Reglan caused the plaintiff's condition, the court wrote that **it was "not permitted to rely on that inference in reviewing [the expert's] report."** *Id. (*emphasis added); see also *Gingrich v. Scarborough*, 2010 WL 1711067, *2-3 (Tex. App.–Beaumont April 29, 2010, no pet.) (Report was insufficient on causation where it stated that the cause of death was combined drug toxicity and pulmonary edema, but it failed to explain why combined drug toxicity occurred, how the combined drug toxicity related to pulmonary edema, or why it was fatal.)

In his report, Dr. Miller is asking the court to infer that failing to give Xarelto caused Ms. Deming to suffer a stroke. He has provided no specifics about Ms. Demings situation to show she suffered a stroke because Xarelto was not administered. Dr. Miller is essentially asking the court infer that all stokes are prevented by Xarelto. Causation cannot be inferred, and, therefore, Dr. Miller's

report is insufficient as to causation.

In the present case, Dr. Miller has simply opined that an alleged breach caused an injury, instead of explaining how and why the alleged breach caused the specific injuries and damages claimed. *Jelinek*, 328 S.W.3d at 539. Accordingly, Dr. Miller's report is inadequate and conclusory, and the trial court abused its discretion in denying Garrison's motion to dismiss.

## V. *Res Ipsa Loquitur* does not excuse production of expert report

Based upon Appellee's arguments at the hearing on Appellant's motion to dismiss, it is anticipated that Appellee will argue that the doctrine of *res ipsa loquitur* applies to this case, therefore, excusing Appellee from the expert report requirements set forth in section 74.351. However, appellate decisions on this issue are quite clear in that even if *res ipsa loquitur* were to be applicable as an evidentiary rule at time of trial, it does not excuse the procedural requirement of providing an expert report pursuant to section 74.351. *See Sherman v. HealthSouth Specialty Hosp.* Inc., 397 S.W.3d 869, 875-876 (Tex. App.–Dallas 2013, pet. denied); *Bogar v. Esparza*, 257 S.W.3d 354, 369 (Tex. App.–Austin 2008, no pet.); *Garcia v. Marichalar*, 198 S.W.3d 250 (Tex. App.–San Antonio 2006, no pet.).

*Res ipsa loquitur* is an evidentiary rule by which negligence may be inferred

by a jury, it is not a cause of action separate and apart from negligence. *Garcia*, 198 S.W.3d at 255. It applies in situations in which (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *Id*. Further, it applies only when "the nature of the alleged malpractice and injuries are plainly within the common knowledge of laymen, requiring no expert testimony." *Sherman*, 397 S.W.3d at 875.[3]

"In contrast, section 74.351's expert requirement establishes a threshold over which claimant must proceed to continue in a lawsuit; it does not establish a requirement for recovery." *Id*. *Res ipsa loquitur* does not eliminate the procedural requirement of an expert report at the commencement of litigation. *See Sherman v. HealthSouth Specialty Hosp.* Inc., 397 S.W.3d 869, 875-876 (Tex. App.–Dallas 2013, pet. denied); Bogar *v. Esparza*, 257 S.W.3d 354, 369 (Tex. App.–2008, no pet.); *Garcia v. Marichalar*, 198 S.W.3d 250 (Tex. App.–San Antonio 2006, no pet.).

Whether *res ipsa loquitur* is applicable to this case or not at time of trial is

---

[3] The legislature has limited the applicability of *res ipsa loquitur* in health care claims only to those cases in which the doctrine had been applied by Texas appellate courts as of August 29, 1977. See Tex. Civ. Prac. & Rem. Code Ann. §74.201. These categories have been limited to (1) negligence in the use of mechanical instruments, (2) operating on the wrong portion of the body, and (3) leaving surgical instruments or sponges within the body. *Sherman*, 397 S.W.3d at 875; *Garcia*, 198 S.W.3d at 256. In the present case, none of these categories apply, so even at any evidentiary stage of this case, the doctrine of *res ipsa loquitur* does not apply.

irrelevant to the issue of the sufficiency of Appellee's expert report from Dr. Miller. Appellee's were required to produce a sufficient expert report and *res ipsa loquitur* does not excuse section 74.351's expert report requirements.

Since Dr. Miller's report is inadequate and conclusory, Garrison filed a motion to dismiss. The trial court denied the motion. The trial court clearly abused its discretion in doing so and this court should reverse and render dismissal of the case.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** GARRISON NURSING HOME AND REHABILITATION CENTER AND GARRISON NURSING HOME, INC., Appellants in the above referenced appeal, asks the court of appeals to reverse the trial court's denial of Appellant's motion to dismiss and render the judgment in favor of Appellants dismissing the Appellees case against it and for such other and further relief either at law or in equity to which Appellants may show just entitlement.

Respectfully submitted,

**KENT, ANDERSON, BUSH,
FROST & METCALF, P.C.**
Woodgate I
1121 E.S.E. Loop 323, Suite 200
Tyler, Texas 75701
(903) 581-5588
(903) 581-3701 (Fax)

By: /s/ David W. Frost
David W. Frost
State Bar No. 24002111
dfrost@tyler.net

**ATTORNEYS FOR APPELLANT**

## CERTIFICATE OF COMPLIANCE

The undersigned certifies this brief complies with the typed-volume limitations of Texas Rule of Appellate Procedure 9. This brief contains 6,696 words and has been prepared in proportionately spaced typeface using Word Perfect X6 in 14 point Times New Roman font.

Dated: September 16, 2015

/s/ David W. Frost

David W. Frost

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically transmitted to the following counsel on this 16th day of September, 2015.

Mr. W. Stephen Shires
Law Office of Stephen Shires, PLLC
123 San Augustine Street
Center, Texas 75935
(936) 598-3031 - FAX

/s/ David W. Frost
David W. Frost

**APPENDICES**

**Order Denying Defendant's Objections to Plaintiff's Supplemental Expert Report and Motion to Dismiss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **A**

**Expert Report of Keith E. Miller, M.D..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **B**

**Tex. Civ. Prac. & Rem. Code Ann. §74.351.** . . . . . . . . . . . . . . . . . . . . . . . . . .  **C**

# APPENDIX "A"

# Order Denying Defendants' Objections to Plaintiff's Supplemental Expert Report and Motion to Dismiss

FILED
_2:42_ _p_.M.
JUN 29 2015
DISTRICT CLERK
NACOGDOCHES COUNTY, TX

NO. <u>C-14-30319</u>

| | | |
|---|---|---|
| LEGATHA DEMINGS | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| V. | § | 145th JUDICIAL DISTRICT |
| | § | |
| GARRISON NURSING HOME AND | § | |
| REHABILITATION CENTER AND | § | |
| GARRISON NURSING HOME, INC. | § | |
| Defendants. | § | OF NACOGDOCHES COUNTY, TEXAS |

## ORDER DENYING DEFENDANTS' OBJECTION TO PLAINTIFF'S
## SUPPLEMENTAL EXPERT REPORT AND SECOND MOTION TO DISMISS

On June 22, 2015, came before the Court Defendants' Objection to Plaintiff's Supplemental Expert Report and Motion to Dismiss (hereinafter the "Motion"). Having considered the Motion, Plaintiff's Response to same, the pleadings, the evidence, and the arguments of counsel, the Court hereby finds that the Motion should be, and is in all things, **DENIED.**

SIGNED on _____ June 29 _____, 2015.

_____
DISTRICT JUDGE PRESIDING

164

# APPENDIX "B"

# Expert Report of Keith E. Miller, M .D.

*Keith E. Miller, M.D., F.A.A.F.P.*

620 Tenaha Street • Center, Texas 75935
(936) 598-2716 • Fax (936) 598-5059

May 4, 2015

Mr. W. Stephen Shires, Attorney at Law
The Law Offices of Stephen Shires, P.L.L.C.
123 San Augustine Street
Center, Texas   75935

Re:  Ms. Legatha Demings

Dear Mr. Shires:

Thank you for allowing me to review this case on behalf of Ms. Legatha Demings.   My opinions in this report are based on the information I have reviewed to date and my education, training, and direct experience in the diagnosis and treatment of patients with conditions similar to those of Ms. Legatha Demings as described in the materials I have reviewed and discussed in this report.   Each opinion is based on reasonable medical and nursing, probability and certainty.

## BACKGROUND

My name is Keith E. Miller, M.D., and I give this report for the purpose of complying with any applicable provisions or codes.  As my attached curriculum vitae demonstrates and which is incorporated into this report by reference, I am a Medical Doctor currently licensed to practice in the State of Texas and formerly licensed in the States of Louisiana and Arkansas.  I currently practice in nursing homes similar to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas.  I have had numerous patients similar to Ms. Legatha Demings.  I am board-certified in Family Medicine and I have been in practice for more than 25 years.  By virtue of my education, training, and direct experience, I am qualified to render opinions regarding the standards of care as they apply to this particular case.



I am over the age of 18, of sound mind, and capable of preparing this expert medical report. My opinions in this report are based on the information I have reviewed to date, as well as my education, training, knowledge, and direct experience in the diagnosis and treatment of patients with conditions similar to those of Ms. Legatha Demings, as described in the materials I have reviewed and discussed in this report. My opinions are based on reasonable medical and nursing, probability and certainty. My opinions concern the care and treatment received by Ms. Legatha Demings, or lack thereof, in regard to the applicable standards of care and the manner, in which the care rendered to Ms. Legatha Demings by the healthcare facility in this case, fell below the standards of care and caused the illnesses of Ms. Legatha Demings.

It is impossible in an expert medical report to marshal all of the proof regarding the standard of care, breach, and causation and include it within my expert opinions in this case. My report represents a good faith effort to inform the health-care facility of the specific conduct that I am calling into question and to provide a basis for anyone to conclude that the claims in this matter have merit. Obviously, any defendant in a medical malpractice case has medical knowledge of medical terms which, when read in context with my opinions, will be clear to any competent healthcare facility.

This report will provide a summary of my opinions, as of this date, regarding: 1) the applicable standards of care at issue in this case; 2) how the applicable standards of care were violated and breached; 3) how the violations and breaches of the applicable standards of care resulted in the illnesses of Ms. Legatha Demings; and 4) what the health-care facility in this case should have done differently to prevent the illnesses of Ms. Demings. I reserve the right to amend, or add to, my opinions upon review of new records, testimony, or facts, as they become available, or upon further review of existing materials.

## MY EXPERTISE

I am a medical doctor currently licensed to practice in the State of Texas and formerly licensed in the States of Louisiana and Arkansas. I have been a licensed medical doctor since 1985, have been practicing medicine continuously since then, including during the time of this claim, and as part of my practice, have been, and am currently, involved in the diagnosis, care, and treatment of many patients similar to Ms. Legatha Demings. I am familiar with the diagnosis and treatment of patients with cerebral vascular accidents (strokes), hypertension, related illnesses and their complications, along with any other conditions experienced by Ms. Legatha Demings. I am familiar with the standards of care applicable to physicians, nurses, hospitals, nursing homes, rehabilitation centers and their staffs that treat patients such as Ms. Demings.

Report of Keith E. Miller, M.D.                                                Page 2

131

My training is similar to the training of the physician, healthcare providers, nurses, and facility staff in this case.

After graduating from medical school in 1985 at the University of Arkansas, I received additional training and experience in a family practice residency program which I successfully completed in 1988. I have over 25 years' experience practicing medicine in office settings, hospitals, nursing homes, rehabilitation centers and emergency departments. I am board-certified in Family Medicine by the American Board of Family Medicine, and have been in practice for more than 25 years. By virtue of my education, training, knowledge and direct experience, I am qualified to render opinions regarding the standards of care as they apply to this particular case, including the standards of care applicable to physicians, nurses, hospitals, nursing homes, rehabilitation centers and their staffs treating patients for strokes, hypertension, related illnesses and their complications, along with any other conditions exhibited by Ms. Legatha Demings, because I have treated many patients with these conditions.

## A COPY OF MY CV IS ATTACHED

My attached curriculum vitae is incorporated herein as part of my report.

## MATERIALS REVIEWED

The specific records and documents concerning Ms. Legatha Demings which I have reviewed include the following:

1) Medical Records of Ms. Legatha Demings from Nacogdoches Medical Center in Nacogdoches, Texas;
2) Garrison Nursing Home and Rehabilitation Center in Garrison, Texas;
3) Plaintiff's Original Petition; and
4) Expert Nursing Report of Pauline Kaper, R.N.

## SIGNIFICANT FACTS

Ms. Legatha Demings is an adult female whose date of birth is April 28, 1945. In May 2012, Ms. Demings was 67 years-old. She had a past medical history of hypertension, atrial fibrillation, congestive heart failure, emphysema, and a previous transient ischemic attack (TIA).

On May 22, 2012, Ms. Demings was living at home. She suddenly developed slurred speech, weakness in her extremities, and she fell out of bed. She was taken to a hospital in Carthage, Texas, and then subsequently

Report of Keith E. Miller, M.D.                                    Page 3

transferred to Nacogdoches Medical Center in Nacogdoches, Texas for further evaluation and treatment.

In the hospital, Ms. Demings was diagnosed as having had a cerebrovascular accident (CVA) or stroke. Ms. Demings was discharged from the hospital on May 25, 2012. In his discharge summary, Ms. Demings' physician documented that this patient's stroke was of "...ischemic origin, most likely caused by her atrial fibrillation."

In order to treat Ms. Demings' condition and prevent further strokes, her physician discharged her from the hospital on a blood-thinning medication, Xarelto. This physician stated in his discharge summary that Ms. Demings would be "...started (on) Xarelto for her anticoagulation to avoid further strokes..."

On May 25, 2012, Ms. Demings was discharged from the hospital and admitted to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas for further recovery and rehabilitation. According to Ms. Demings' physician, this resident had begun to make some improvement as evidenced by improvement in her speech and increased movement of her left side.

After being in the care of Garrison Nursing Home and Rehabilitation Center for less than two weeks, Ms. Demings became "confused, combative, and unable to communicate". On June 8, 2012, she was taken by emergency medical services back to Nacogdoches Medical Center for emergency evaluation. There a computerized tomography (CT) scan of her head revealed an ischemic infarction of her brain consistent with a stroke.

One of Ms. Demings' consulting physicians, a neurological specialist, documented in the medical record that Ms. Demings had suffered a "Cerebrovascular accident extension with newly developed global aphasia, aphasia and left-sided flaccid paralysis".

Ms. Demings remained in the hospital for 12 days, and was discharged on June 20, 2012. At the time of her discharge from the hospital, Ms. Demings' physician noted in his discharge summary that this patient's overall medical condition had deteriorated as a result of her stroke she suffered at Garrison Nursing home and Rehabilitation Center, to the point that Ms. Demings was made a do-not-resuscitate status such that if she experienced a cardiovascular or respiratory failure, she would not be intubated or placed on a ventilator or breathing machine.

A "Medication Error Report" made by the nursing staff of Garrison Nursing Home and Rehabilitation Center on June 8, 2012, documented that from the

Report of Keith E. Miller, M.D.                                    Page 4

133

time Ms. Demings was first admitted to this facility on May 25, 2012 until the time of her stroke and transfer on June 8, 2012, Ms. Demings was not given her blood-thinning medication, Xarelto as ordered by her physician. This medication had been ordered to be given in a dose of 20 milligrams (mgs) at bedtime daily.

This same report stated that "res. (resident) arrived after 5:00 pm on a Friday. This medication (Xarelto) was ordered along (with) all other meds from nursing home pharmacy – nurse transcribing orders had to have all meds written on pharmacy order sheets and faxed in to pharmacy by 6 pm so they could be delivered that night".

The Medication Error Report went on to document that a nurse at this nursing home "failed to transcribe this med (medication) to MAR (Medication Administration Record)"..."an oversight". A question on this same form asked "Could the error have endangered the life or welfare of the patient?" The responsible nurse completing the form answered the question with "Makes her a higher risk for stroke in view of her diag (diagnosis) of atrial fibrillation."

On a subsequent hospitalization on August 5, 2012, in his pre-operative history and physical, one of Ms. Demings' physicians documented what had happened to her during her stay at Garrison Nursing Home and Rehabilitation Center from May 25, 2012 through June 8, 2012. This physician stated that prior to her first admission to this nursing home, Ms. Demings "was found in atrial fibrillation. She was started (on) Xarelto. Apparently... did not follow-through in the nursing home, and she had...strokes, disabling, with severe ____. She was rendered substantially disabled."

This physician also documented in his discharge summary of this August 5, 2012 hospital stay, the importance of a patient such as Ms. Demings who suffered with atrial fibrillation, to always remain on a blood-thinning medication such as Xarelto. He stated that "She is to continue with Xarelto...Instructions were given to the family to make sure that this medication is never stopped."

## FAMILIARITY WITH THE STANDARD OF CARE

At the time of the care and treatment of Ms. Legatha Demings by Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, from May 2012 through June 2012, I was familiar with the minimum medical standards of care applicable to the assessment, diagnosis and treatment of patients with strokes, hypertension, and related illnesses, as well as their complications and other medical conditions similar to those experienced by Ms. Legatha Demings and described in the referenced medical records. I am familiar with the medical and nursing standards of care for the above referenced conditions applicable to

Garrison Nursing Home and Rehabilitation Center in Garrison, Texas. The minimum standards of care for treatment of patients with similar signs, symptoms, and conditions as Ms. Legatha Demings that are the basis of this report, are national standards of care and do not differ from community to community.

From the time of the medical treatment of Ms. Legatha Demings from May 2012 through June 2012, and through the present, I have had an active clinical practice as a family practitioner in Center, Texas that includes providing care to adult patients in nursing homes and rehabilitation centers, such as Ms. Legatha Demings. During my career as a family practitioner, I have worked with and or supervised medical office staff, hospital staff, nursing home staff, and rehabilitation center staff, including medical technologists and nurses, in the care of my patients. I have also participated in the development and use of protocols, policies and procedures for the care of patients with strokes, hypertension, and related illnesses, as well as their causes and complications, including adults such as Ms. Legatha Demings. In addition, based on my education, training, knowledge, and direct experience, I am familiar with the accepted and expected, standards of care, as listed below, for nursing home and rehabilitation center facilities, who take care of patients with conditions such as strokes, hypertension, related illnesses, and their complications, and can offer opinions on the standards of care, the breaches of the standards of care and the causation of the injuries from these breaches.

In my medical practice, I routinely rely on medical records, nursing records, lab reports, diagnostic tests and images, consulting physician reports and other patient data. I consider materials of this type to be generally reliable, unless evidenced otherwise, and they are the type of materials routinely relied upon by physicians and clinical staff in providing care to patients.

## CASE SPECIFIC EXPERTISE

At the time of the medical treatment of Ms. Legatha Demings, from May 2012 through June 2012, I was treating patients with symptoms similar to those experienced by Ms. Demings. I am familiar with the accepted medical and nursing standards of care applicable to the assessment, diagnosis, and treatment of patients with strokes, hypertension, and related illnesses, as well as any other medical conditions similar to those experienced by Ms. Legatha Demings during that time as described in the referenced medical records. I am familiar with the standards of care for physicians, nurses, and nursing home and rehabilitation center staff treating patients such as Ms. Demings. I am familiar with the medical and nursing standards of care for the above referenced medical conditions, including strokes, hypertension, related illnesses, and their

Report of Keith E. Miller, M.D.                                    Page 6

135

complications, as they apply to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas. The accepted and applicable standards of care for the treatment of patients with similar signs, symptoms, and conditions as Ms. Legatha Demings, that are the basis of this report, are national standards of care and do not differ from community to community, and also apply to the specific medical care provided to Ms. Demings in this case. The accepted medical and nursing standards of care for the assessment, diagnosis, and treatment of medical conditions similar to those of Ms. Legatha Demings apply to all nursing home and rehabilitation center facilities. I know the accepted standards of care, the breaches and violations of the standards of care, and the causation link between the breaches and violations of the standards of care and the illnesses, of Ms. Legatha Demings, as they apply to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, on the basis of my education, knowledge, training, and direct experience.

I acquired this education, knowledge, training and experience through:

1) My attending, and successfully completing, medical school classes, and residency, that teach the evaluation, diagnosis, care and treatment of patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

2) Practical experience of diagnosing and treating patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

3) Discussions with colleagues at yearly conferences, seminars and meetings;

4) Study of technical works routinely published in textbooks, journals and literature concerning the evaluation, diagnosis, care and treatment of patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

5) My routine discussions and consultations with other physicians who also treat patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

6) My routine and regular contact with nursing home nurses, staff and residents who take care of patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

7) My knowledge and experience giving lectures and in-service conferences to the nurses and staff;

8) My experience serving on numerous hospital and nursing home committees; and

9) My observation of nurses and nurse conduct, supervising residents, and instructing nurses and residents in the evaluation, diagnosis, care and treatment of patients the same as, or similar to Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications.

## FACILITY - PATIENT RELATIONSHIP

Based upon the above facts, there was a facility-patient relationship established between Ms. Legatha Demings and Garrison Nursing Home and Rehabilitation Center in Garrison, Texas.

## DUTY

There was a duty owed to Ms. Legatha Demings by Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, to do what a reasonable nursing home or rehabilitation center would have done under the same or similar circumstances, or not to do what a reasonable nursing home or rehabilitation center would not have done under the same or similar circumstances.

## RELEVANT STANDARDS OF CARE IN ISSUE

This section addresses some of the principal applicable standards of care that Garrison Nursing Home and Rehabilitation Center in Garrison, Texas and its staff should have met for Ms. Legatha Demings, specifically how Garrison Nursing Home and Rehabilitation Center and its staff breached the standards of care and the causal relationship of the breach to Ms. Demings' illnesses and related complications. These standards are based on my education, training, and direct experience, and are reflected in the state and federal regulations that govern nursing homes, rehabilitation centers, and skilled nursing facilities.

The following standards, among others, are consistent with the standards of care that were required to be followed by Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, and its staff as it concerns Ms. Legatha Demings:

**1. TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and reg-

istered nurses with advanced practice authorization shall: (A) Know and conform to the Texas Nursing Practice Act and the Board's rules and regulations as well as all federal, state, or local laws, rules or regulations affecting the nurse's current area of nursing practice;

2. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (B) Implement measures to promote a safe environment for clients and others;

3. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (C) Know the rationale for and the effects of medications and treatments and shall correctly administer the same;

4. **TAC Subchapter H Rule §19.701.** A facility must care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life. (5) Accommodation of needs. A resident has the right to: (A) reside and receive services in the facility with reasonable accommodation of individual needs and preferences, except when the health or safety of the individual or other residents would be endangered;

5. **TAC Subchapter B Rule §19.101 Neglect** - A deprivation of life's necessities of food, water, or shelter, or a failure of an individual to provide services, treatment, or care to a resident which causes or could cause mental or physical injury, or harm or death to the resident.

6. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (D) Accurately and completely report and document: (iii) physician, dentist, or podiatrist orders; (iv) administration of medications and treatments; (v) client responses(s); and (vi) contacts with other health care team members concerning significant events regarding client's status; (G) Obtain instruction and supervision as necessary when implementing nursing procedures or practices; (N) Clarify any order or treatment regimen that the nurse has reason to believe is inaccurate, non-efficacious or contraindicated by consulting with the appropriate licensed practitioner and notifying the ordering practitioner when the nurse makes the decision not to administer the medication or treatment.

7. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and

registered nurses with advanced practice authorization shall: (F) Promote and participate in education and counseling to a client(s) and, where applicable, the family/significant other(s) based on health needs;

8. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (G) Obtain instruction and supervision as necessary when implementing nursing procedures or practices;

9. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (M) Institute appropriate nursing interventions that might be required to stabilize a client's condition and/or prevent complications;

10. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (T) Accept only those nursing assignments that take into consideration client safety and that are commensurate with the nurse's educational preparation, experience, knowledge, and physical and emotional ability;

11. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (U) Supervise nursing care provided by others for whom the nurse is professionally responsible;

12. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (3) Standards Specific to Registered Nurses. The registered nurse shall assist in the determination of healthcare needs of clients and shall: (A) Utilize a systematic approach to provide individualized, goal-directed, nursing care by: (i) performing comprehensive nursing assessments regarding the health status of the client; (ii) making nursing diagnoses that serve as the basis for the strategy of care; (iii) developing a plan of care based on the assessment and nursing diagnosis; (iv) implementing nursing care; and (v) evaluating the client's responses to nursing interventions;

13. **TAC Chapter 217 Rule §217.12 Unprofessional Conduct** (1) Unsafe Practice – actions or conduct including, but not limited to: (A) Carelessly failing, repeatedly failing, or exhibiting an inability to perform vocational, registered, or advanced practice nursing in conformity with the standards of minimum

acceptable level of nursing practice set out in Rule 217.11.

14. **TAC Chapter 217 Rule §217.12 Unprofessional Conduct** (1) Unsafe Practice – actions or conduct including, but not limited to: (B) Carelessly or repeatedly failing to conform to generally accepted nursing standards in applicable practice settings;

15. **TAC Chapter 217 Rule §217.12 Unprofessional Conduct** (4) Careless or repetitive conduct that may endanger a client's life, health, or safety. Actual injury to a client need not be established.

16. **42 CFR 483.20, 483.25**-The facility must conduct initially a comprehensive, accurate assessment of each resident's functional capacity, a plan of care, based on a resident assessment, which will be used to provide care and services to attain the highest practical physical, mental, and psychosocial well-being;

17. **42 CFR 483.15**- A facility must care for its residents in a manner that promotes quality of life and dignity;

18. **42 CFR 483.30**- The facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care;

19. **42 CFR 483.13, F 224- "Neglect"** means failure to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness.

20. **42 CFR 483.20 (k) (3) (l)** - The services provided or arranged by the facility must meet professional standards of quality;

## HOW THE STANDARDS OF CARE WERE BREACHED AND CAUSED INJURY, HARM, OR DAMAGES

### Illnesses Caused by Failing to Properly Administer Medications

Ms. Legatha Demings is an adult female whose date of birth is April 28, 1945. In May 2012, Ms. Demings was 67 years-old. She had a past medical history of hypertension, atrial fibrillation, congestive heart failure, emphysema, and a previous transient ischemic attack (TIA).

On May 22, 2012, Ms. Demings was living at home. She suddenly developed slurred speech, weakness in her extremities, and she fell out of bed. She was taken to a hospital in Carthage, Texas, and then subsequently transferred to Nacogdoches Medical Center in Nacogdoches, Texas for further evaluation and treatment.

In the hospital, Ms. Demings was diagnosed as having had a cerebrovascular accident (CVA) or stroke. Ms. Demings was discharged from the hospital on May 25, 2012. In his discharge summary, Ms. Demings' physician documented that this patient's stroke was of "...ischemic origin, most likely caused by her atrial fibrillation."

In order to treat Ms. Demings' condition and prevent further strokes, her physician discharged her from the hospital on a blood-thinning medication, Xarelto. This physician stated in his discharge summary that Ms. Demings would be "...started (on) Xarelto for her anticoagulation to avoid further strokes..."

On May 25, 2012, Ms. Demings was discharged from the hospital and admitted to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas for further recovery and rehabilitation. According to Ms. Demings' physician, this resident had begun to make some improvement as evidenced by improvement in her speech and increased movement of her left side.

After being in the care of Garrison Nursing Home and Rehabilitation Center for less than two weeks, Ms. Demings became "confused, combative, and unable to communicate". On June 8, 2012, she was taken by emergency medical services back to Nacogdoches Medical Center for emergency evaluation. There a computerized tomography (CT) scan of her head revealed an ischemic infarction of her brain consistent with a stroke.

One of Ms. Demings' consulting physicians, a neurological specialist, documented in the medical record that Ms. Demings had suffered a "Cerebrovascular accident extension with newly developed global aphasia, aphasia and left-sided flaccid paralysis".

Ms. Demings remained in the hospital for 12 days, and was discharged on June 20, 2012. At the time of her discharge from the hospital, Ms. Demings' physician noted in his discharge summary that this patient's overall medical condition had deteriorated as a result of her stroke she suffered at Garrison Nursing home and Rehabilitation Center, to the point that Ms. Demings was made a do-not-resuscitate status such that if she experienced a cardiovascular or respiratory failure, she would not be intubated or placed on a ventilator or breathing machine.

A "Medication Error Report" made by the nursing staff of Garrison Nursing Home and Rehabilitation Center on June 8, 2012, documented that from the time Ms. Demings was first admitted to this facility on May 25, 2012 until the time of her stroke and transfer on June 8, 2012, Ms. Demings was not given her blood-thinning medication, Xarelto as ordered by her physician. This medication had been ordered to be given in a dose of 20 milligrams (mgs) at bedtime daily.

This same report stated that "res. (resident) arrived after 5:00 pm on a Friday. This medication (Xarelto) was ordered along (with) all other meds from nursing home pharmacy – nurse transcribing orders had to have all meds written on pharmacy order sheets and faxed in to pharmacy by 6 pm so they could be delivered that night".

The Medication Error Report went on to document that a nurse at this nursing home "failed to transcribe this med (medication) to MAR (Medication Administration Record)"..."an oversight". A question on this same form asked "Could the error have endangered the life or welfare of the patient?" The responsible nurse completing the form answered the question with "Makes her a higher risk for stroke in view of her diag (diagnosis) of atrial fibrillation."

On a subsequent hospitalization on August 5, 2012, in his pre-operative history and physical, one of Ms. Demings' physicians documented what had happened to her during her stay at Garrison Nursing Home and Rehabilitation Center from May 25, 2012 through June 8, 2012. This physician stated that prior to her first admission to this nursing home, Ms. Demings "was found in atrial fibrillation. She was started (on) Xarelto. Apparently... did not follow-through in the nursing home, and she had...strokes, disabling, with severe ____. She was rendered substantially disabled."

This physician also documented in his discharge summary of this August 5, 2012 hospital stay, the importance of a patient such as Ms. Demings who suffered with atrial fibrillation, to always remain on a blood-thinning medication such as Xarelto. He stated that "She is to continue with Xarelto...Instructions were given to the family to make sure that this medication is never stopped."

The staff of Garrison Nursing Home and Rehabilitation Center in Garrison, Texas failed to appreciate that Ms. Legatha Demings was at the highest risk for the development of future strokes due to her past medical history which included hypertension, atrial fibrillation, a previous TIA, and a previous stroke.

The nursing staff of Garrison Nursing Home and Rehabilitation Center obviously needed better training in safe and systematic methods to properly transfer medication orders to their MAR. Ms. Demings arrived at this nursing home in

the late evening on a Friday. The Medication Error Report indicated that the staff of this nursing home was under a short deadline to get Ms. Demings' medication orders to the pharmacy in order to obtain her medications by that evening otherwise they would not receive her medications until at least the following day or perhaps even longer since the following day fell on a weekend. It is certain that the nurse transcribing these pharmacy orders felt pressured to get this process done quickly. Unfortunately there was no procedure in place at the time of this incident to ensure that medication orders would always be accurately and precisely transcribed by the nursing staff of this facility, even under stressful situations.

After it was recognized by this nursing home staff that Ms. Demings had failed to properly receive her medications, the nursing staff of this facility recognized the need to improve their procedures for medication ordering from the pharmacy. In the Medication Error Report, the nursing staff responded to a question which asked, "What precautions can you take to prevent a similar error?" The nurse completing this report answered by stating "always have two nurses check orders on new admissions to make sure (orders are) transcribed correctly".

The specific steps of an appropriate procedure for Ms. Demings would have been tailored to her and would have been determined by an extensive assessment by the nursing staff. These measures would have included such things as having in place an appropriate plan to ensure this resident's medication orders were properly transcribed to her MAR, ensure that her medications were properly ordered and received from the pharmacy, and comparing her physician's orders with her MAR to ensure her original medication orders were always being properly carried out.

As a direct cause, this facility and its staff failed to comply with those standards set forth in paragraph numbers: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20. It is my opinion, based upon my experience, knowledge, qualifications and review of these records that these standards were not followed and the result was that Ms. Legatha Demings was harmed and injured. The failure to comply with these standards caused, within a reasonable degree of medical and nursing, probability and certainty, Ms. Demings to suffer a stroke, extensive hospitalization, rehabilitation, and related complications, which compromised her overall health and well-being, and resulted in an overall worsening of her condition, unnecessary and preventable pain, suffering, mental anguish, and loss of dignity. These injuries and illnesses could have, within a reasonable degree of medical and nursing, probability and certainty, been prevented or detected/addressed earlier if these standards had been followed.

To meet the standards, Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, and its staff were required to do among other things the following when caring for Ms. Legatha Demings:

A. Recognize and act on the fact that Ms. Legatha Demings was at high risk for illnesses due to a stroke and its related complications, by preparing and following a Care Plan based on an accurate assessment;

B. Specifically implement an effective and accurate Care Plan by ensuring:

  1. That the Care Plan which included the method for safely and accurately administering Ms. Demings' medications was implemented and used at all times;

  2. That Ms. Demings had sufficient and knowledgeable personnel for properly administering her medications safely;

C. Ensure that a safe and appropriate system was in place to make sure that Ms. Demings' physician orders for medications were properly and accurately transcribed and transmitted to the pharmacy;

D. Put in place a method to recheck Ms. Demings' physician mediation orders from time to time to ensure she was receiving all her necessary, prescribed medications; and

E. Inform and Educate Ms. Demings' family and/or caretakers to the risk of suffering illnesses including strokes if she did not properly receive her medications.


### SUMMARY

I have been advised that "*Negligence*" means:

*Negligence, when used with respect to the conduct of a medical facility means failure to use ordinary care, that is, failing to do that which a medical facility of ordinary prudence would have done under the same or similar circumstances or doing that which a medical facility of ordinary prudence would not have done under the same or similar circumstances.*

I have been advised *"proximate cause"* means:

> *That cause which, in a natural and continuous sequence, produces an event, and without cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a health care facility, using ordinary care, would have foreseen that the event or some similar event might reasonably result there from. There may be more than one proximate cause of an event.*

More likely than not, this failure on the part of Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, to practice in an acceptable manner directly resulted in Ms. Legatha Demings' illnesses due to a stroke and its complications, as well as overall worsening of her condition, unnecessary and preventable pain, suffering, extensive hospitalization, mental anguish, and loss of dignity. As more specifically set forth above, the actions and inactions of this facility caused the conditions and complications described above.

In summary, Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, did not meet the standard of care in their treatment of Ms. Legatha Demings. It is my opinion, based on my medical education, experience, and training and based upon a reasonable degree of medical and nursing, probability and certainty, that these negligent acts and omissions as stated above proximately caused Ms. Demings' illnesses due to a stroke, and their complications, along with overall worsening of condition, as well as caused her unnecessary and preventable pain, extensive hospitalization, suffering, mental anguish, and loss of dignity. It is my opinion that Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, knew or should have known that their failure to meet the standards of care would put Ms. Demings at extreme risk of harm and knew or should have known that this failure to meet these standards would likely cause complications or illnesses to Ms. Demings. Nevertheless, Garrison Nursing Home and Rehabilitation Center still failed to follow the above standards. Had the standards of care been followed by Garrison Nursing Home and Rehabilitation Center, more likely than not and based upon a reasonable degree of medical and nursing, probability and certainty, Ms. Demings would not have suffered the illnesses due to a stroke, along with their complications, as well as overall worsening of her condition, unnecessary and preventable pain, suffering, extensive hospitalization, mental anguish, and loss of dignity.

Respectfully submitted,

Keith E. Miller, M.D.
620 Tenaha Street
Center, Texas   75935

# CURRICULUM VITAE

## KEITH E. MILLER, M.D.

620 Tenaha Street

Center, Texas   75935

(936) 598-2716

# KEITH E. MILLER, M.D.

## - EDUCATION -

Chief Resident, 7/87 to 6/88
University of Arkansas Medical Sciences Campus
Area Health Education Center, South Arkansas
El Dorado, Arkansas

Family Practice Residency, 7/86 to 6/88
University of Arkansas Medical Sciences Campus
Area Health Education Center, South Arkansas
El Dorado, Arkansas

Family Practice Internship, 7/85 to 6/86
University Hospital
Little Rock, Arkansas

Doctor of Medicine Degree, 8/81 to 5/85
University of Arkansas College of Medicine
Little Rock, Arkansas

Attended, 8/80 to 5/81
University of Arkansas at Little Rock, School of Law
Little Rock, Arkansas

Bachelor of Arts, 8/76 to 5/79
German and Chemistry
Baylor of University
Waco, Texas

Attended, 8/75 to 5/76
Biology and Chemistry
East Texas Baptist College
Marshall, Texas

Shelbyville High School, 8/71 to 5/75
Shelbyville, Texas

2

# KEITH E. MILLER, M.D.

## -PRACTICE ACTIVITIES-

Full Time Family Medicine Practice, July 1988 to Present

Commissioner, 9/03 to 9/07
Texas State Board of Medical Examiners / Texas Medical Board
State Medical Licensing Board of Texas

Physician Consultant for Physician Peer Review, 8/90 to 9/03
Texas State Board of Medical Examiners
State Medical Licensing Board of Texas

Member, Texas Statewide Medical Advisory Committee, 8/95 to Present
Blue Cross/Blue Shield of Texas
Performs Physician Peer Review for All Blue Cross/Blue Shield Patients in Texas

President, 1990 to Present
Shelby County Medical Society

Advisory Committee Member and Clinical Faculty, 8/90 to Present
School of Licensed Vocational Nursing
Panola College
Center, Texas

Member, Board of Directors, and Medical Director, 8/90 to Present
Shelby County Child Advocacy Center
Center, Texas

2014 to Present
Family Medicine Service Privileges
Memorial Hospital San Augustine
San Augustine, Texas

2014 to Present
Family Medicine Service Privileges
Nacogdoches Medical Center
Nacogdoches, Texas

Former Physician Reviewer, Texas Medical Foundation, 8/90 to 8/03
Performs Physician Peer Review/Quality Assurance for
All Medicare and Champus Patients in Texas

3

## -PRACTICE ACTIVITIES (CONTINUED)-

Former Clinical Faculty, Preceptor, 8/90 to 8/03
University of Texas Health Sciences Center
Family Practice Residency Program
Tyler, Texas

Former Director of Emergency Services, 8/90 to 8/11
Shelby Regional Medical Center
Center, Texas

Former Chief of Staff
Shelby Regional Medical Center
Center, Texas

July 1988 to 2013
Full Time Active Family Practice Privileges
Shelby Regional Medical Center
Center, Texas

September 2010 to Present
Medical Director
Legacy Hospice of Center
Center, Texas

March 2011 to Present
Assistant Medical Director
The Hospice of East Texas
Tyler, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Holiday Nursing Home
Center, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Pine Grove Nursing Home
Center, Texas

4

# KEITH E. MILLER, M.D.

## -PRACTICE ACTIVITIES (CONTINUED)-

July 1988 to Present
Full Time Active Family Practice Privileges
Green Acres Nursing Home
Center, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Twin Lakes Nursing Home
San Augustine, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Colonial Pines Nursing Home
San Augustine, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Trinity Nursing and Rehabilitation Center
San Augustine, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
El Camino House Nursing Home
San Augustine, Texas

December 2013 to Present
Full Time Active Family Practice Privileges
Lakeside Village Assisted Living
Center, Texas

March 2012 to Present
Medical Director
Bethany Home Health Care Agency
Carthage, Texas

January 2014 to May 2015
Medical Director, Jennings Place
Day Care for Mentally Challenged Adults
Center, Texas

5

# KEITH E. MILLER, M.D.

---

## - BOARD CERTIFICATIONS -

American Board of Family Medicine, ID 53861

Certification Date July 8, 1988

Re-Certification Date July 14, 1995

Re-Certification Date July 12, 2002

Re-Certification Date July 15, 2010

## - PROFESSIONAL CERTIFICATIONS -

Hospice Medical Director Certified (HMDC)
Hospice Medical Director Certification Board
July 8, 2014 to Present

Certified Medical Review Officer
Medical Review Officer Certification Council
United States Department of Transportation
United States Department of Health and Human Services
Certified February 21, 2006
Re-certified March 24, 2012

Certified Medical Examiner
Federal Motor Carrier Safety Administration
United States Department of Transportation
United States Department of Health and Human Services
Certified February 11, 2014

Fellow (AAFP), 1990 to Present
American Academy of Family Physicians

American Heart Association
CPR Instructor
Advanced Cardiac Life Support Instructor
Pediatric Advanced Life Support Provider

6

# KEITH E. MILLER, M.D.

## - PROFESSIONAL AFFILIATIONS -

American Medical Association

Southern Medical Association

American Academy of Family Physicians

Texas Medical Association

Shelby County Medical Society

## - VOLUNTEER ACTIVITIES -

Texas State Legislature
Physician of the Day, 1989 to Present

Coordinator, Free Physicals Programs, 1988 to Present
Department of Athletics
Center Independent School District, Center, Texas

Team Physician, 1988 to Present
Department of Athletics
Center Independent School District

Vice-President, Board of Trustees, 1990 to 1999
Center Independent School District, Center, Texas

Preceptor, 1990 to Present
Texas Statewide Medical Student Preceptorship Program

Member, Development Council
Baylor University

Former Member, Committee on Rural Health Concerns
Texas Medical Association

Former Member, Committee on Rural Health
Texas Academy of Family Physicians

7

# KEITH E. MILLER, M.D.

## -LICENSURE-

State of Texas (H-2155), 8/87 to Present

Formerly Licensed in Arkansas and Louisiana

## - AWARDS -

Texas Academy of Physician Assistants
Supervising Physician of the Year - 2004

American Medical Association
Physician's Recognition Award

American Academy of Family Physicians
Award for Clinical Instruction of Medical Students

Center Independent School District
Community Service Award for Contributions to
Student Academics and Athletics

Anderson County Educational Cooperative
Service Award for Organizing Programs for
Special Services Students

Texas State Legislature
Award of Appreciation for Serving as
Physician to Legislators While in Session

## - PUBLICATIONS -

"Use of Digoxin in the Family Practice Setting"
*Journal of the Arkansas Medical Society*
February 1988

8

# KEITH E. MILLER, M.D.

## - ARTICLES -

"More Doctors in Texas After Malpractice Caps"
*New York Times*
October 5, 2007
Story of Texas Medical Board Responding to Increased Licensing
Demands During My Tenure as Chairman of the Licensing Committee

"Dangerous Doctors"
*Reader's Digest*
June 2004
Background Story of Texas Medical Board Prior to My
Appointment as a Commissioner

"Dangerous Doctors – Follow-Up"
*Reader's Digest*
March 2005
Follow-up Story of Texas Medical Board After My
Appointment as a Commissioner Including Motion Made by Myself for the Largest Fine
Levied Against a Doctor by any State in History

"No Medicinal Jet Fuel"
*Texas Medicine*
August 2009
Story of My Filing of Complaint Against a Physician for Non-Therapeutic Prescribing

## - PERSONAL -

Married to Linda Gee Miller since 1975

Interests Are Health-Care Reform and Finance Issues, in America and Abroad

Speaks Fluent German and Passable Spanish

Instrument-Rated Private Aircraft Pilot

Umpire, High School Baseball

9

# APPENDIX "C"

# Section 74.351, Texas Civil Practice and Remedies Code

| Vernon's Texas Statutes and Codes Annotated |
| Civil Practice and Remedies Code (Refs & Annos) |
| Title 4. Liability in Tort |
| Chapter 74. Medical Liability (Refs & Annos) |
| Subchapter H. Procedural Provisions (Refs & Annos) |

V.T.C.A., Civil Practice & Remedies Code § 74.351

§ 74.351. Expert Report

Effective: September 1, 2013

Currentness

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

(b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

(c) If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice.

(d) to (h) [Subsections (d)-(h) reserved]

(i) Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

(j) Nothing in this section shall be construed to require the serving of an expert report regarding any issue other than an issue relating to liability or causation.

(k) Subject to Subsection (t), an expert report served under this section:

(1) is not admissible in evidence by any party;

(2) shall not be used in a deposition, trial, or other proceeding; and

(3) shall not be referred to by any party during the course of the action for any purpose.

(*l*) A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

(m) to (q) [Subsections (m)-(q) reserved]

(r) In this section:

(1) "Affected parties" means the claimant and the physician or health care provider who are directly affected by an act or agreement required or permitted by this section and does not include other parties to an action who are not directly affected by that particular act or agreement.

(2) "Claim" means a health care liability claim.

(3) [reserved]

(4) "Defendant" means a physician or health care provider against whom a health care liability claim is asserted. The term includes a third-party defendant, cross-defendant, or counterdefendant.

(5) "Expert" means:

(A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

(B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;

(C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence;

(D) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a dentist, a dentist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence; or

(E) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a podiatrist, a podiatrist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

(s) Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for the acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care through:

(1) written discovery as defined in Rule 192.7, Texas Rules of Civil Procedure;

(2) depositions on written questions under Rule 200, Texas Rules of Civil Procedure; and

(3) discovery from nonparties under Rule 205, Texas Rules of Civil Procedure.

(t) If an expert report is used by the claimant in the course of the action for any purpose other than to meet the service requirement of Subsection (a), the restrictions imposed by Subsection (k) on use of the expert report by any party are waived.

(u) Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a).

**Credits**

Added by Acts 2003, 78th Leg., ch. 204, § 10.01, eff. Sept. 1, 2003. Amended by Acts 2005, 79th Leg., ch. 635, § 1, eff. Sept. 1, 2005; Acts 2013, 83rd Leg., ch. 870 (H.B. 658), § 2, eff. Sept. 1, 2013.

V. T. C. A., Civil Practice & Remedies Code § 74.351, TX CIV PRAC & REM § 74.351
Current through the end of the 2015 Regular Session of the 84th Legislature

End of Document © 2015 Thomson Reuters. No claim to original U.S. Government Works.