STATE of Missouri, Respondent,

v.

David Michael HOLMAN, Appellant.

No. 28021.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 14, 2007.

Matthew Michael Ward, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Mary H. Moore, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

David Michael Holman ("Appellant") was convicted by the trial court of two counts of violating section 570.030 by stealing funds from the checking account of South Morgan Township ("the Township") in Dade County, Missouri.[1] Following a bench trial, the trial court suspended imposition of sentence as to Count I. The trial court then sentenced Appellant to three years imprisonment on Count II, but suspended the execution of the sentence and placed Appellant on probation for a term of five years. Appellant was also ordered to pay restitution in the amount of $8,570.20.[2] Appellant solely challenges his conviction under Count II.[3]

Viewing the evidence in the light most favorable to the trial court's verdict, *State v. Shockley*, 98 S.W.3d 885, 887 (Mo.App. 2003), the record reveals that in 1995 Appellant was elected as a board member of the Township. According to the testimony at trial, at bi-annual elections the Township voters would elect two board members, a trustee or treasurer, and a clerk and collector. At the time Appellant was elected as a board member, Wife was elected as clerk of the Township and Harold Dunn ("Mr. Dunn") was elected as trustee. There have been no other elections held in the Township since 1995. In 2001, Mr. Dunn found himself unable to continue to perform his duties as trustee and turned the Township books, including the check book and certain equipment, over to Appellant and Wife.

Deputy Max Huffman ("Deputy Huffman") of the Dade County Sheriff's Department testified that he was asked by the prosecuting attorney of Dade County to investigate the Township's financial records. He stated that in February of 2004

---

1. All statutory references are to RSMo Cum. Supp.2002 and all rule references are to Missouri Court Rules (2006).

2. Appellant and his wife, Tamara Holman ("Wife"), were tried together and the order for restitution set out that it was to be paid jointly by Appellant and Wife. Wife is not associated with this appeal.

3. In the Amended Information, Count II charged that Appellant committed the class C

felony of stealing in violation of section 570.030:

> in that from January 1, 2004[,] through December 31, 2004, . . . [Appellant] appropriated funds from the checking account of the . . . Township in excess of five-hundred dollars but less than twenty five thousand dollars, which property was owned by [the] Township, and [Appellant] appropriated such property without consent or by means of deceit with the purpose to deprive [the] Township thereof.

he met with Wife, who was "very cooperative" and "very friendly." Wife provided Deputy Huffman with the Township's checking account information as well as cancelled checks and check stubs. When Deputy Huffman spoke with Wife she stated she did not know the title of her official position with the Township, but that she "took care of the checking account and the books." She told the deputy that she was not sure of Appellant's title either, and that "they had just started doing things that needed to be done after Mr. Dunn had passed away." She stated that she "took care of the checkbook" and Appellant "always signed the checks."

■ At trial, Deputy Huffman testified as to the details of eight checks at issue which were written during the time period covered by Count II.[4]

In this connection, Deputy Huffman testified that check number 1744 was written on January 7, 2004, for $834.00 to Wife and the memo line indicated the payment was for "[p]apers, fill out and trustee."[5] However, the check stub and check register relating to check number 1744 was blank.

Deputy Huffman also stated that check number 1746 was made payable to Appellant in the amount of $321.67. Wife told Deputy Huffman that Appellant " 'signed the check and [she] wrote it. It was for both of [them] cleaning ditches. We both endorsed the check.' " The memo line on the check stated it was for "[l]abor," but the check register entry for this check was blank. The check was endorsed by both Appellant and Wife.

Deputy Huffman also testified that check number 1747 was made payable to Wife in the amount of $346.21 for "bookkeeping." Wife explained to Deputy Huffman that the check was "for out-of-pocket expenses. [She did not] have any records or worksheets. [She] just didn't keep any. [She] wrote the check and [Appellant] signed it." The check register indicated that the check was made payable "to the Dadeville Road" for "[t]axes." Wife was unable to explain this apparent discrepancy to Deputy Huffman.

According to Deputy Huffman, check number 1748 was made payable to Wife "[f]or bookkeeping and ditch cleaning" in the amount of $821.42 on March 12, 2004. Wife told Deputy Huffman this check was

---

4. Although it appears the checks were entered into evidence at trial, Appellant has failed to include them in his record on appeal. It is Appellant's duty to compile the record on appeal which should contain all of the exhibits and evidence necessary for this Court's determination of the questions presented. Rule 30.04; *see State v. Hackler*, 122 S.W.3d 132, 135 (Mo.App.2003). Appellant has breached this duty. Ordinarily, we would be "unable to give meaningful review to Appellant's claim of error," *id.* at 136, however, in the present matter there was extensive, detailed testimony by Deputy Huffman regarding the checks at issue. Accordingly, we rely on that testimony to assist us in our review of this appeal.

5. Wife told Deputy Huffman that she paid herself trustee fees as allowed by statute and

she calculated that amount at "3 percent of everything [she] deposited. . . ."

While Appellant and Wife may have been entitled to certain statutory fees depending on their positions within the Township, we note that throughout Appellant's brief he seems to assert that the calculation of trustee fees recited by Deputy Huffman at trial and used by the trial court in calculating Appellant's restitution were incorrect. This issue was not raised in Appellant's point relied on. It has long been held that this Court limits " 'our review to matters raised in the points relied on. . . .' " *State v. Ernst*, 164 S.W.3d 70, 73 n. 4 (Mo.App.2005) (quoting *State v. Coody*, 867 S.W.2d 661, 664 n. 1 (Mo.App.1993)); *see* Rule 84.04. Accordingly, we shall not address Appellant's complaints about the calculation of trustee fees or the amount of his restitution in this opinion.

for "ditch cleaning, piling brush and clean up of ditches before grading. It did not cover any bookkeeping. It was figured at $8 per hour for each of [them]." The check was endorsed by Wife and the accompanying check register entry was "completely blank."

Deputy Huffman also stated that check number 1751 was made payable to Appellant in the amount of $894.00. The memo line on the check indicated it was for "[l]abor" and the check was endorsed by Appellant. Wife told Deputy Huffman the check was "for brush hog and spraying . . . and fuel." The check register indicated the check "was payable to [Appellant] . . . for helping Allen work roads." Wife stated she did not have any receipts relating to this check. Wife was unable to explain to Deputy Huffman the discrepancy in the memo line and in the check register notation.

Deputy Huffman related that check number 1753 was made payable to Wife in the amount of $325.00 and was signed by Appellant. The memo line indicated the check was for "[p]icking up brush and hauling brush." The coordinating check register was empty of any notations relating to this check except that it indicated the check was for $225.00 instead of $325.00.

Deputy Huffman testified that check number 1754 was made payable to Appellant in the amount of $862.40. The check, which was signed by Appellant, stated it was for "cutting brush and tractor tires." The check register contained no notations relating to this check. There were no attendant receipts.

Deputy Huffman also stated that check number 1755 was made payable to Appellant and signed by Appellant. The check was executed in the amount of $327.41, and set out it was for "[d]igging tin horns." Wife told Deputy Huffman the check was

"figured . . . at $10 per hour, labor, diesel and tractor." The check register for this check indicated its amount, but no other notations.

Deputy Huffman testified that in his review of the Township financial records it appeared that "[i]n 2002, the accounts seemed to be fairly complete or kept up complete in the check stubs and check register. As it continued on in 2003 and 2004, there . . . [were] more entries missing, totals were not carried forward, entries were not made at all." He stated that as time passed the number of checks written directly to Wife and Appellant "increased significantly, as well as the amounts of the checks."

At trial, Appellant testified that from 2002 to 2004 he was "on the board" of the Township, but related he did not know if he was a trustee. He stated that at that time Wife "was kind of clerk, treasurer, bookkeeper." He also related that he and Wife initially got involved with the Township after Mr. Dunn became ill and they agreed to take over "the books, the equipment and the headache." He stated he and Wife received no training in bookkeeping or in their responsibilities for the Township's finances. He related that Wife "pretty well tried to keep the books up, keep the bills paid" and he "took all the calls. . . . There is a limb in the road. There is a tree on the road, making sure the roads were graded, making sure the snow was pushed off, doing the FEMA work. Just whatever needed to be done." He stated his duties included finding someone to haul and spread chat on the roads as well as personally removing dead dogs from the roads, removing tree limbs, and arranging to have the roads graded. He was responsible for brush hogging the Township's property and right of ways with the Township's tractor or his own tractor. He stated there were between

19.5 miles and 22.3 miles of roads in the Township under his care. He stated he paid himself between $10.00 and $15.00 per hour depending on the particular job. Appellant also explained that sometimes he paid himself based on "how much profanity was used on what [he] did. If [he] was flagged down in the middle of the road, and it usually started with profanity and ended with profanity, [he] usually tacked a little extra on...." He stated he "pretty much told [Wife] what to write [his] checks for ..." and she did so.

Appellant also related that Wife typically filled out the checks and he signed them. When asked if he felt "odd writing any checks to [him]self," he stated that he did. He stated that when they first took over the finances in 2001, they went "to a meeting [with the county commissioners] ... to discuss what [he] thought was probably financial statements. When [he] got over here, there was a discussion about somebody complained the brush was bad." He stated that when he left the meeting it was his understanding that he

> was to take care of the roads and the right of ways, and if [he did] the work, [he] was pretty adamant that [he] didn't want to pay [him]self, but if [he] had to get out and do all of the running around on the roads and taking care of the roads, [he] was going to be compensated.

He related that when he left the meeting he felt like he had the consent of the county commission to write checks to himself for work he performed for the Township.

Appellant also stated that he felt like he and Wife "were doing what had been done

before, taking care of the roads." He stated that Mr. Dunn "had always [written] the checks out and had done the work, paid himself...." He related that some of the checks at issue were reimbursements for money he and Wife had paid out of their own pocket for the Township's needs. He also stated that he "couldn't really pack that great big checkbook around with [him]. And if [he] had to run to ... pick up some parts or whatever ... [he] would pay for it and was reimbursed...." He stated the memo lines on the checks were small and he could not "get a lot on there."

In explanation for the fact that the bookkeeping got progressively worse during his tenure with the Township, Appellant explained that the Township's revenues decreased during that time period. He stated the Township received revenue from "CART money," which was paid out by the county, and road district tax money. He stated that in 2003 and part of 2004 the Township did not receive CART money because the Township had to file a financial statement to receive the money and there were some problems which were preventing the filing of the financial statement.[6]

Appellant also testified that there were no minutes of official Township meetings, but there were many unofficial meetings "at a ball game or at the local gas station or just out on the road." Appellant related he was "a record nut" and he tried to "keep everything down and [he] did have quite a bit of it [written down];" however, he did not know what happened to all of the documentation. He stated he did not know if there were any receipts for bills or

---

**6.** Appellant admitted that in December of 2004 he was charged and convicted of failure to file Township financial statements in the years 2002 and 2003. He testified that the charges were the result of "a couple of checks

that [they] couldn't account for, that were supposedly sent to [them] by the ... county treasurer, that w[ere] never cashed, never turned up anywhere, but [they] couldn't file a financial statement without those."

payments relating to the monies paid out by the Township. Appellant testified he did not solicit public bids for Township work and usually just did the work himself. Appellant also related he tried to get help from county commissioners in straightening out the Township's finances, but he never received help. He admitted that in 2003 the Township received $13,457.00 in total receipts and he and Wife were paid $4,801.00. He acknowledged that the total receipts for the Township in 2004 were $7,344.49 and Appellant and Wife were paid $5,702.11 during that year. Appellant asserted that he and Wife did not steal any money from the Township.

At the close of all the evidence, the trial court convicted Appellant of two counts of stealing. The trial court found that

ignorance of the law is never an excuse in the operation of public duties. I can understand the position that you folks felt that you were put in, but with no elections since 1995, neither of you are properly elected as treasurer, being entitled to any of the fees or a percentage. And no matter how well intentioned it may have been, you just can't step into statutorily described duties and responsibilities haphazardly or you are going to risk the penalties of law that are set out in the statutes.

I can overlook sloppy bookkeeping and I can understand that, if it weren't for some of these just out right misstatement and misrepresentations and apparent fraud in what is written down in the books, that shows to me that there was deceit necessary under the stealing statutes.

It appears to me that a lot of these figures and the checks written were just kind of pulled out of the air. No, no record of how you came up with the amounts that were going to be paid, just wrote down some kind of, some kind of amount.

And I guess some of it depends upon how rude the people were to you, if you felt insulted, that is how much [you would] charge. That's not the way that you can operate as a public official. It looks to me like the pattern that I see that it was a convenient bank account to use and just kind of, especially as you got to [2004], it became kind of your personal checking. You took what you wanted when you wanted to.

So I'm going to enter findings of guilty on both Counts I and II in each case, because I feel that it got worse as time went on.

Thereafter, the trial court suspended imposition of sentence on Count I and sentenced Appellant to three years imprisonment on Count II with the execution of sentence suspended. Appellant was also placed on probation for five years. This appeal followed.

■ In his sole point of trial court error, Appellant maintains the trial court erred in overruling his motion for judgment of acquittal and in convicting him of stealing. Specifically, he asserts the trial court's rulings violated his due process rights in that "the evidence was insufficient to establish beyond a reasonable doubt that [Appellant] took money from the ... Township without consent or by deceit. There was no evidence that [Appellant] did not perform the work that he claimed, and the evidence did not show that this was anything besides poor bookkeeping."

■ The appellate court reviews the sufficiency of the evidence in a court-tried criminal case by applying the same standard used in a jury-tried case. *State v. Agee*, 37 S.W.3d 834, 836 (Mo.App.2001); *see Shockley*, 98 S.W.3d at 890. Addition-

ally, " '[w]e review the denial of a motion for acquittal to determine if the [S]tate adduced sufficient evidence to make a submissible case.' " *State v. Howard*, 973 S.W.2d 902, 906 (Mo.App.1998) (quoting *State v. Foster*, 930 S.W.2d 62, 63 (Mo.App. 1996)). Where Appellant contests the sufficiency of the evidence to support his conviction, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable trier-of-fact might have found Appellant guilty beyond a reasonable doubt. *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995); *Agee*, 37 S.W.3d at 836.

> 'The Court is required to take the evidence in the light most favorable to the State and to grant the State all reasonable inferences from the evidence. The Court disregards contrary inferences, unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them.'

*State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001) (quoting *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993)).

 It is axiomatic that in resolving conflicts in the evidence, a trial court is not bound to accept a defendant's self-serving claims or explanations. *State v. Fraga*, 189 S.W.3d 585, 591 (Mo.App.2006). "The credibility and weight of testimony are for the fact-finder to determine. The fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002) (internal citation omitted).

In our review we need not review Appellant's assertions relating to the lack of evidence showing him to be guilty of taking money without consent. This is because there is sufficient evidence showing that Appellant appropriated the Township's funds by means of deceit.

 Section 570.030.1 sets out that "[a] person commits the crime of stealing if he or she appropriates property or services of another with the purpose to deprive him or her thereof, *either* without his or her consent *or by means of deceit or coercion.*" (Emphasis added); *see State v. Presberry*, 128 S.W.3d 80, 91 (Mo.App. 2003). Section 570.010(7) sets out, in pertinent part, that " '[d]eceit' means purposely making a representation which is false and which the actor does not believe to be true and upon which the victim relies, as to a matter of fact, law, value, intention or other state of mind." "The only intent required to commit the act of stealing is the intent to deprive the owner of the property or services being appropriated." *State v. Bradshaw*, 81 S.W.3d 14, 21 (Mo. App.2002). Stated another way, there are four essential elements to the crime of stealing by deceit: (1) an appropriation; (2) of property of another; (3) with purpose to deprive the other thereof; and (4) accomplished by means of deceit. *State v. Goebel*, 83 S.W.3d 639, 642 (Mo.App.2002).

Here, the evidence shows a pattern of deceit by Appellant. In 2004, Appellant signed four checks made payable to himself and four checks payable to Wife out of the Township checkbook. Out of those eight checks, six had no explanation for payment or payee information listed on the check stubs; one listed the wrong amount on the check stub; one contained a memo notation that it was to Wife for "bookkeeping" but the check register stated it was "to the Dadeville Road" for "[t]axes;" one stub stated it was payable to Appellant "for helping Allen work roads," but Wife explained to Deputy Huffman that it was for tractor use, fuel, brush hogging, and spraying; and one stated it was for "digging tin horns," but Wife told Deputy

Huffman it was for labor, tractor use, and fuel. Only one of the eight checks was made out for a consistent amount, listed the same notation on both the memo line and the check stub, and was properly recorded in the check register.

As previously related, Appellant offered no documentation to support any of these payments to Wife or himself, and he was unable to explain the reason for the lack of documentation. Furthermore, Appellant's only explanation for his poor bookkeeping was the fact that it was difficult for him to carry the "great big checkbook around with [him]" and he was unable to fit much information on the small memo lines of the checks. "The subjective intent of a defendant to deceive may be proven by circumstantial evidence." *State v. Watson*, 947 S.W.2d 514, 516 (Mo.App. 1997); *see State v. Inscore*, 592 S.W.2d 809, 811 (Mo. banc 1980) (holding that the subjective intent of a defendant at the time of the commission of a crime is rarely open to direct proof and intent may be proven by circumstantial evidence). Here, there is sufficient evidence supporting the proposition that Appellant's poor bookkeeping was in reality an effort to conceal his deceit and misappropriation of the Township's funds.

The trial court did not err in overruling Appellant's motion for judgment of acquittal and in finding him guilty of stealing. There was sufficient evidence to prove beyond a reasonable doubt that Appellant violated section 570.030 by stealing funds from the Township by means of deceit. § 570.030.1. Appellant's point lacks merit.

The judgment and sentence of the trial court is affirmed.

GARRISON and LYNCH, JJ., Concur.