

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI,    )
                      )
    Plaintiff-Respondent,    )
                      )
vs.                   )    No. SD37330
                      )
SETH ANDREW GOMEZ,    )    **Filed:  June 30, 2023**
                      )
    Defendant-Appellant.    )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

The Honorable Jason R. Brown, Judge

**<u>AFFIRMED</u>**

Seth Andrew Gomez ("Gomez") waived his right to a jury trial and, following a bench trial, the Circuit Court of Greene County ("trial court") convicted him of first-degree murder and armed criminal action.[1]  Gomez appeals the trial court's judgment convicting him of first-degree murder, claiming the trial court erred in overruling his motion for judgment of acquittal at the close of the State's evidence because the evidence adduced at trial was insufficient to prove Gomez deliberated before killing Calvin Allen,

---

[1] Gomez does not contest his conviction for armed criminal action on appeal.  We therefore treat any such argument as abandoned and focus only on his conviction for first-degree murder.

1

Jr. ("Victim").[2]  While Gomez's brief fails to comply with the mandatory provisions of Rule 84.04 governing appellate briefing, the State argues the merits of Gomez's point in its Respondent's brief, and we are nonetheless able to discern he is raising a sufficiency-of-the-evidence challenge.[3]  Our Supreme Court "'long has held that sufficiency claims are considered on appeal even if not briefed or not properly briefed in the appellate courts.'"  *State v. Lehman*, 617 S.W.3d 843, 847 n.4 (Mo. banc 2021) (quoting *State v. Claycomb*, 470 S.W.3d 358, 361 (Mo. banc 2015)).  We therefore review Gomez's appeal on the merits and affirm the trial court's judgment.[4]

### Factual Background and Procedural History

On March 1, 2019, Amanda Simrin ("Simrin"), a friend of both Gomez and Victim, booked a motel room, room 230, at the Ozark Inn on North Glenstone in Springfield, Missouri.  Simrin, Gomez's girlfriend Rachel Slobig ("Slobig"), Victim, and Gomez met that afternoon at room 230 to talk, listen to music, and use illicit drugs.

---

[2] Gomez raises two points, but the points are identical and the arguments as to each point are identical or nearly identical.  Therefore, we consider Gomez to have raised a single point challenging the sufficiency of the evidence to support his first-degree murder conviction.

[3] All rule references are to Missouri Court Rules (2023), unless otherwise specified.

[4] Had Gomez's claim not been sufficiency of the evidence, the serious briefing deficiencies were grounds for dismissal.  Missouri courts have shown a recent willingness to dismiss appeals for failure to comply with Rule 84.04.  *See, e.g.*, *Lexow v. Boeing Co.*, 643 S.W.3d 501, 509-10 (Mo. banc 2022); *see also* *Pickett v. Bostwick*, 667 S.W.3d 653, 659-62 (Mo. App. W.D. 2023); *LT Group USA, LLC v. Clark*, 667 S.W.3d 631, 634-36 (Mo. App. E.D. 2023); *Farr v. State*, 665 S.W.3d 394, 401 (Mo. App. S.D. 2023); *Wilson v. Schmelzer*, 653 S.W.3d 913, 917 (Mo. App. E.D. 2022); *Gan v. Schrock*, 652 S.W.3d 703, 711 (Mo. App. W.D. 2022); *Young v. Missouri Dep't of Soc. Servs.*, 647 S.W.3d 73, 78 (Mo. App. E.D. 2022); *Jefferson v. Missouri Dep't of Soc. Servs.*, 648 S.W.3d 50, 55 (Mo. App. E.D. 2022).  We are reviewing Gomez's noncompliant points on appeal solely because they argue sufficiency of the evidence.

Several other individuals also came to and from the motel room to use drugs throughout the day.

When Gomez arrived at the motel room, he and Victim had a conversation to "clear up some issues" they had been having about "somebody having more money than the other person and they weren't happy about that" stemming from a "lick" they were involved in. Tensions were "pretty high" in the room during that time. After several people left the room, it was calm and quiet.

Simrin left the motel room sometime around 8:00 p.m., leaving Gomez, Slobig, Victim, and Bailey Stoddard ("Stoddard"), who had joined the group sometime that afternoon, in the room. The individuals were "doing [their] own thing" listening to music, doing drugs, and being on their phones. Gomez texted Simrin between 11:06 p.m. and 11:07 p.m., told her he needed a ride "asap" and it was an emergency, and directed her to wait in the car with it on. Gomez texted further, "It's an emergency, hotel, don't tell Domo or Russell you're picking me up and let [Stoddard] know low key in the bathroom." Gomez told Simrin, "Not in the bathroom you wait in the car have the car still on." He also instructed Simrin to delete their text conversation and told her Victim was "fine."

After several hours of relaxation, continued drug use, and "quiet" in the room, Victim was in and out of sleep around midnight. Gomez was putting on Victim's clothes, trading shoes, and asking to wear Victim's stuff. Specifically, green boots, a black shirt with gold bees around the neck, and a green backpack. Around midnight, Gomez told Slobig and Stoddard to go into the bathroom.

3

Slobig heard "what sounded like a fight or like a scuffle" on the other side of the bathroom door. She tried to get out of the door, but Stoddard would not move her arm. When Slobig finally left the bathroom, she saw Gomez standing over Victim next to the bed while stabbing Victim in the back of the head and then the throat with a knife. Slobig asked him to stop, but Gomez "wouldn't look up from what he was doing." Victim raised his arms to defend himself from Gomez.

Slobig saw Stoddard leave the room, so Slobig turned and departed too. Stoddard and Slobig heard gunshots as they left the Ozark Inn. Slobig then saw Gomez "five or ten minutes later" after the incident when they met up at the "Glenwood Manor" and caught a ride together to a house on Florida Street.

Springfield Police Officer Joseph Pyle ("Officer Pyle") received a call for service during the early morning hours of March 2, 2019, and he arrived at the Ozark Inn about 16 minutes after midnight. When Officer Pyle arrived, he could see "what looked like" a person laying on the second-floor balcony. He went to the second floor and saw a male covered in blood with his shirt pulled up and his pants slightly below his waist. Victim had 14 incised injuries near his left pinky, right thumb, and right finger, and wounds to the upper right portion of his shoulder, one near his right ear and right neck, one on his right inner thigh, and to his back. Victim also had nine gunshot wounds in his arm, elbow, genitals, leg, and back. Keith Norton ("Norton"), a forensic pathologist for the State, testified at trial he determined, "to a reasonable degree of medical certainty," the gunshot to the left side of Victim's back was the cause of death.

Officers eventually entered room 230 and discovered two beds covered in blood, blood splattered about on the south and east walls, blood on the wall above one of the

4

beds, blood on the air-conditioning unit, a grouping of three spent shell casings in the center walkway, one "unspent bullet" approximately one foot away, blood on the doorway inside and leading to it, a flashlight attachment for a handgun, a pink sock that matched the sock on Victim's foot with a bloody shell casing in it, a hospital bracelet with "Rachel Elizabeth Slobig" on it, an empty prescription bottle prescribed to Gomez, and one "spent bullet" near the door on the inside.

Gomez ended up at a home he frequented on Hoffman Street around 8:30 a.m., on March 2, 2019. Gomez informed Angel Perreira ("Perreira"), a resident of the Hoffman Street house and friend, "I just killed [Victim] cuz." Gomez informed her he had stabbed Victim in the room and shot him on the balcony. When Slobig came to the Hoffman Street house around noon, she noted Gomez had changed his clothes. The clothes Gomez had been wearing the day before were in the bathtub and hanging up around the house after already having been washed.

Springfield police officers executed a search warrant for the Hoffman Street house later that evening. Gomez and Slobig were at the Hoffman Street house at the time, and officers located a knife and firearm on Gomez's person. They also located a pair of green Timberline boots and a green backpack with red staining. Garrett Schmitz from the Missouri State Highway Patrol Crime Lab testified that the blood found on the knife taken from Gomez's person and green backpack matched Victim's DNA profile. Slobig was taken to the Springfield Police Department's headquarters where Detective Kelly Patton ("Detective Patton") interviewed her. She told Detective Patton she had no clue what had happened and had seen an article about Victim being found deceased.

5

Slobig was later arrested for violating the terms of her probation on an unrelated matter. Gomez, after his arrest, used a tablet from the Greene County Jail to ask Stoddard and his mother to "video visit" Slobig to tell her he loved her and that she needed to "keep her head up." Gomez warned his mother, "[Slobig] got locked up and they are trying to get her to testify against me[.] [Y]ou need to make sure she stays on my good side." On May 29, 2019, while still in custody, Slobig agreed to speak to Detective Patton about Victim's murder. She decided to speak to Detective Patton because, in her own words, "it was just weighing on [her] shoulders," she "couldn't sleep at night," and she "struggled with what to do with that decision for a while, and thought it was just the right thing to do."

The State charged Gomez with armed criminal action and first-degree murder. *See* sections 571.015, RSMo 2016, and 565.020.[5] Slobig recounted the events leading up to Victim's murder at trial. She admitted to initially lying to Detective Patton and that she was in custody when she later told him what had happened on May 29, 2019. Slobig testified she understood her prior release from custody to be independent from her providing a statement to Detective Patton, and she further confirmed she did not make a "deal" to testify in order to get out of jail.

Following the bench trial, the trial court found Gomez guilty of both charges. This appeal followed.

**Analysis: Sufficiency of the Evidence**

We consider Gomez's argument as the State interpreted it – that the trial court erred in overruling Gomez's motion for judgment of acquittal at the close of the State's

---

[5] All references to statutes are to RSMo Cum. Supp. 2022, unless otherwise indicated.

6

evidence because there was insufficient evidence to establish guilt beyond a reasonable doubt in that the State failed to prove Gomez acted with deliberation or cool reflection before causing the death of Victim as required to sustain a conviction for murder in the first degree – and find the State presented sufficient evidence for a reasonable trier of fact to find Gomez guilty.

<em>Standard of Review</em>

"The trial court's findings have the force and effect of the verdict of a jury in a court-tried criminal case." **State v. Shands**, 661 S.W.3d 381, 382 (Mo. App. S.D. 2023). "Accordingly, the standard used to review the sufficiency of the evidence in a court-tried and a jury-tried criminal case is the same." **Id.** (internal quotations and citation omitted). "'[W]e review a trial court's ruling on a motion for judgment of acquittal to determine whether there was sufficient evidence from which the trial court could have found the defendant guilty beyond a reasonable doubt.'" **State v. Sinks**, 652 S.W.3d 322, 334 (Mo. App. E.D. 2022) (quoting **State v. Peeler**, 603 S.W.3d 917, 920 (Mo. App. E.D. 2020)). "Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt." **State v. Lammers**, 479 S.W.3d 624, 632 (Mo. banc 2016).

"In reviewing sufficiency of the evidence, we accept as true all evidence and inferences favorable to the State; all contrary evidence and inferences are disregarded." **Shands**, 661 S.W.3d at 382. Additionally, "'[w]hen reviewing the sufficiency of evidence supporting a criminal conviction, the Court does not act as a super juror with veto powers, but gives great deference to the trier of fact.'" **State v. Fodrini**, 570 S.W.3d

7

170, 173 (Mo. App. E.D. 2019) (quoting *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011)).

*The Underlying Charge*

The State alleged in Count I of the Amended Felony Information that Gomez committed murder in the first degree when he, "after deliberation, knowingly caused the death of [Victim] by shooting him." To prove murder in the first degree, the State was required to present evidence proving Gomez: (1) knowingly (2) caused the death of another person (Victim) by shooting him (3) after deliberation upon the matter. *State v. Shaddox*, 598 S.W.3d 691, 695 (Mo. App. S.D. 2020); Section 565.020.1 ("A person commits the offense of murder in the first degree if he or she knowingly causes the death of another person after deliberation upon the matter.").

Gomez does not challenge the evidence was sufficient for a reasonable fact-finder to find beyond a reasonable doubt that he knowingly caused Victim's death or that Victim's death resulted from a gunshot. Rather, he claims the State failed to prove the third element of the charge – that he deliberated upon the matter.

"Deliberation" means "cool reflection for any length of time no matter how brief[.]" Section 565.002(5). "Deliberation is not a question of time — an instant is sufficient — and the reference to 'cool reflection' does not require that the defendant be detached or disinterested." *State v. Nathan*, 404 S.W.3d 253, 266 (Mo. banc 2013). Proving deliberation requires "'only that the killer had ample opportunity to terminate the attack once it began.'" *State v. Oldham*, 642 S.W.3d 350, 353-54 (Mo. App. S.D. 2022) (quoting *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004)). The element of

8

deliberation ensures that the trier of fact believes the defendant acted consciously and not reflexively. ***Shaddox***, 598 S.W.3d at 696.

<u>*There was Sufficient Evidence of Deliberation Based on Circumstantial Evidence*</u>

Gomez contends the State's evidence of deliberation was insufficient because it was circumstantial. This complaint ignores that, "'[d]irect proof of a required mental state is seldom available, and the mental state may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying.'" ***State v. Perkins***, 600 S.W.3d 838, 847 (Mo. App. E.D. 2020) (quoting ***State v. Johns***, 34 S.W.3d 93, 110 (Mo. banc 2000)). The term "circumstantial" can connote a lack of credibility in common parlance, but all it means here is that the State may supply indirect and inferential evidence to prove a criminal defendant's mental state because the intangible nature of thoughts makes direct proof rare if not nonexistent. *See* ***id.*** at 847. For instance, the element of deliberation may be inferred from the circumstances surrounding the murder. ***State v. Miller***, 220 S.W.3d 862, 868 (Mo. App. W.D. 2007).

> "The State may prove its case by presenting direct or circumstantial evidence." [*State v.*] *Jones*, 553 S.W.3d [909,] 913 [(Mo. App. S.D. 2018)] (internal quotation omitted). "Upon appellate review, circumstantial evidence is given the same weight as direct evidence and the factfinder may make reasonable inferences from the evidence presented." *Id.* (internal quotation omitted); *see also Peeler*, 603 S.W.3d at 920 (quoting [*State v.*] *Brown*, 360 S.W.3d [919,] 922 [(Mo. App. W.D. 2012)]) ("Reasonable inferences can be drawn from both direct and circumstantial evidence, and circumstantial evidence alone can be sufficient to support a conviction.").

***Sinks***, 652 S.W.3d at 335.

The State's "circumstantial" evidence was sufficient to support a finding of deliberation. The trial court heard of a pre-existing "bad-blood" relationship between Gomez and Victim over money. A trier of fact can infer motive to kill, and hence

9

deliberation, from an acrimonious relationship. *Miller*, 220 S.W.3d at 868. Before Gomez committed the murder, he messaged Simrin and told her to pick him up. He directed Simrin to delete their exchanged messages and explained that Victim was "fine." The trial court could reasonably infer from these exchanges that Gomez was securing a means of escape before attacking Victim and was already preparing to conceal his involvement. *See Shaddox*, 598 S.W.3d at 696 ("Evidence that a defendant did or said certain things prior to the act in order to facilitate the crime, also known as 'planning evidence,' is conduct relevant to deliberation."). Gomez also brought a gun to the motel room and used it to kill Victim. This alone supports the inference that Gomez planned to murder Victim. *See, e.g.*, *State v. Martin*, 607 S.W.3d 274, 281 (Mo. App. S.D. 2020) (inferring deliberation from bringing a gun to a crime scene).

Circumstantial evidence also established Victim being stabbed and shot multiple times. A victim's multiple wounds may reflect a criminal defendant deliberating on his actions and proceeding to continue after having an opportunity to stop. *E.g.*, *State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002) (deliberation inferred from multiple gunshot wounds and disposal of murder weapon); *State v. Howery*, 427 S.W.3d 236, 247 (Mo. App. E.D. 2014) (deliberation inferred from multiple blows to a victim's skull). Multiple injuries and repeated blows, especially a gunshot to the back when Victim was turned away, suggest Gomez had "'ample opportunity to stop the attack'" but proceeded further after deliberation. *Shaddox*, 598 S.W.3d at 696 (quoting *State v. Olivas*, 431 S.W.3d 575, 580 (Mo. App. W.D. 2014)). Additional circumstances include Victim's body being found outside the motel room on the balcony, Slobig asking Gomez to stop stabbing Victim, and Victim raising his arms to defend himself from Gomez. A reasonable fact-

10

finder could infer Gomez could have stopped the attack at each point – when Victim attempted to leave the motel room, when Slobig asked him to stop, or when Victim defended himself – but deliberately chose to continue.

Gomez's thoughts are his own, and convictions for first-degree murder would be near-impossible in most instances were we to require direct evidence of mental deliberation. We therefore reject Gomez's argument that the evidence was insufficient simply because it was circumstantial.

### *There was Sufficient Evidence of Deliberation because Gomez did not Need to Contemplate Murdering Victim for any Set Period of Time*

Gomez attempts to portray the climactic events leading up to and during the killing as a showing of his inability to deliberate on his actions before killing Victim. According to Gomez, the violent stabbings and shooting preceded by a calm period of drug use and relaxation show "a chaotic scene that was over in a very short period of time." This brevity between peace and death does not foreclose deliberation.

The trial court could reasonably find Gomez had a moment to deliberate. He was in the motel room with Victim for several hours. He took the time to secure a means of escape and attempted to facilitate his efforts by telling Slobig and Stoddard to leave him alone with Victim. Furthermore, deliberation requires "'only that the killer had ample opportunity to terminate the attack once it began.'" ***Oldham***, 642 S.W.3d at 353-54 (quoting ***Strong***, 142 S.W.3d at 717). Not only could Gomez have stopped the attack once Victim attempted to leave the room, Gomez deliberately prolonged the violence by switching weapons.

11

*There was Sufficient Evidence of Deliberation Based on Gomez's Post-Murder Conduct*

Defendant's conduct after the murder was sufficient to prove he deliberated. It is commonly understood that "[a] defendant's conduct after the murder, as well as the disposal of evidence, can also support a finding of deliberation." ***Howery***, 427 S.W.3d at 246. This is because such actions can display a consciousness of guilt and remove any doubt the defendant had not intended to complete the killing. ***Id.*** at 245.

Gomez failed to treat Victim after he stabbed and shot Victim, and Gomez did not seek aid from medical professionals to resuscitate Victim. He, instead, fled the crime scene and left Victim to die. These decisions reflect a lack of concern for Victim's wellbeing, which can in turn indicate Gomez deliberated and intended harm before attacking Victim. ***Oldham***, 642 S.W.3d at 354 ("Instead of rendering aid, [Defendant] fled and police were never able to locate his gun."). He also made numerous attempts to dispose of or hide the evidence of his crime. He told Simrin to delete their exchanged text messages. Gomez then washed the clothes he was wearing shortly after the murder. He even texted Stoddard and his mother from jail to approach Slobig to ensure she would stay on his "good side" and not testify against him. A reasonable trier of fact could have seen all such steps to spoil evidence as indicia of deliberation. ***Tisius***, 92 S.W.3d at 764 ("Disposing of evidence and flight can support the inference of deliberation.").

Gomez's actions after killing Victim are all emblematic of deliberation. The trial court could have reasonably found deliberation beyond a reasonable doubt based on Gomez fleeing the crime scene, directing Simirin to delete evidence, washing his clothes shortly after the killing, and attempting to convince Slobig to not testify against him.

Each action in isolation suggests deliberation. Each action in isolation is enough to infer deliberation. Taken together, the evidence of deliberation was more than sufficient.

*Gomez's Drug Use and Voluntary Intoxication do not Negate His Ability to Deliberate*

Gomez's brief claims his consumption of drugs before the killing must have impacted his ability to form the requisite intent to deliberate on his decision to murder Victim. We disagree.

As Gomez recounts, both he and Victim were consuming drugs throughout the night. Norton testified Victim had methamphetamine and marijuana in his system when he died and explained methamphetamine use can cause paranoia. Gomez believes, because "the drugs that were being used would distort one's mental ability to make conscious decisions or to deliberate," the trial court could not have found Gomez deliberated before acting beyond a reasonable doubt. This assertion neglects long-standing law.

The Missouri General Assembly has tailored how intoxication or a drugged state may impact criminal liability. Section 562.076.1 provides:

> A person who is in an intoxicated or drugged condition, whether from alcohol, drugs or other substance, is criminally responsible for conduct unless such condition is involuntarily produced and deprived him or her of the capacity to know or appreciate the nature, quality or wrongfulness of his or her conduct.

This language follows court precedent which similarly states:

> A person who voluntarily puts himself or herself into a drugged condition is capable of forming an intent to kill. **That the drugs may remove a person's inhibitions and make the person more likely to act rashly, impulsively and anti-socially and increase the person's susceptibility to passion and anger does not alter the person's capacity to intend to kill.**

13

***State v. Roberts***, 948 S.W.2d 577, 588 (Mo. banc 1997) (emphasis added). Missouri courts have treated a sober person and a voluntarily intoxicated person equally for purposes of culpability since at least 1855. ***State v. Hefflinger***, 101 S.W.3d 296, 300 (Mo. App. E.D. 2003). Furthermore, "since 1984 when [section 562.076] was changed, [it] has provided that evidence of voluntary intoxication is not admissible to negate the mental state of an offense." ***Mouse v. State***, 90 S.W.3d 145, 149 (Mo. App. S.D. 2002).

Gomez's choice to ingest drugs of his own volition makes him subject to the plain language of section 562.076 and related case law. He cannot rely on his intoxication to argue he was incapable of deliberating or otherwise failed to appreciate the nature of his actions when he killed Victim. *See* ***Roberts***, 948 S.W.2d at 588 (stating a trier of fact "'may not consider [voluntary] intoxication on the issue of the defendant's mental state.'") (quoting ***State v. Erwin***, 848 S.W.2d 476, 482 (Mo. banc 1993)) (alteration in original).

### *A Reasonable Trier of Fact Could Have Found Slobig Credible Despite her Contradictory Statements*

Gomez spends much of his brief attacking Slobig's credibility. He maintains there was insufficient evidence to support his conviction for first-degree murder because Slobig's testimony was inconsistent. Slobig initially told investigators that she had no knowledge of the murder, but recanted her earlier statements at trial. Slobig said she decided to finally tell the truth about the murder because "it was just the right thing to do." Gomez casts Slobig as motivated by her desire to get out of jail after violating probation. According to Gomez, the "story changing coincided with her being out of custody, going into custody and then being released by the State upon her new desire to

14

talk to [law enforcement] set up by her mom and the lead prosecutor in the Gomez case." Gomez essentially asks us to find Slobig not credible.

The trial court, as the fact-finder, is the ultimate arbiter of credibility and it "'may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.'" *State v. Livingston-Rivard*, 461 S.W.3d 463, 466-67 (Mo. App. S.D. 2015) (quoting *State v. Holman*, 230 S.W.3d 77, 83 (Mo. App. S.D. 2007)); *State v. Casey*, 683 S.W.2d 282, 286 (Mo. App. S.D. 1984) ("Such overlooks that the credibility of witnesses is for trial court determination."). Claims on appeal that a witness was not credible invoke evidence contrary to the judgment, and we accordingly disregard them per our standard of review. *Shands*, 661 S.W.3d at 382. In addition, "'[t]he testimony of a single witness is sufficient to support a conviction even if the testimony of the witness is inconsistent.'" *State v. Hansen*, 660 S.W.3d 45, 49 n.2 (Mo. App. S.D. 2023) (quoting *State v. Dodd*, 637 S.W.3d 659, 668 (Mo. App. W.D. 2021)).

The trial court found Slobig's account of the murder credible. We will not second-guess that determination here. Rather than viewing her changing testimony as being a product of self-interest, the trial court could have reasonably concluded Slobig eventually told the truth out of her good nature. Slobig explained she was not forthright with investigators because she was scared right after the murder and did not want to get her boyfriend, Gomez, in trouble. By May of 2019, her involvement as a witness to the murder was "weighing" on her shoulders, and Slobig testified she "couldn't sleep at night" due to her guilt. The trial court could have gathered from these statements that

15

Slobig initially lied to protect Gomez but told the truth after she mustered the moral courage to testify.

Slobig's testimony also directly addressed any potential accusation that her testimony changed solely so she could avoid prosecution. She confirmed she understood her release from custody was not related to her willingness to tell the truth about Victim's murder. We do not find the evidence of Gomez's guilt was insufficient merely because the State relied on Slobig's testimony to prove its case. Even if Slobig's credibility was questionable, the State presented further evidence corroborating her accusations. Perreira testified that Gomez confessed to murdering Victim. He confided to Perreira that he had both stabbed and shot Victim. A trier of fact could have relied on Gomez's confession, relayed by Perreira, and found he committed first-degree murder beyond a reasonable doubt even if the trier of fact found Slobig not credible.

## Conclusion

We reject Gomez's arguments and find the State presented sufficient evidence for the trial court to find him guilty of first-degree murder beyond a reasonable doubt. The State's presentation of circumstantial evidence and testimony of Gomez's actions before, during, and after the murder all support a finding of deliberation. Deliberation does not require a set minimum amount of time for purposes of first-degree murder, and Gomez cannot rely on his voluntary intoxication to negate his intent to commit murder or deliberation thereof. Further, this Court must defer to the trial court's credibility determinations.

Points I and II are denied. The trial court's judgment is affirmed.

JENNIFER R. GROWCOCK, J. – OPINION AUTHOR

JACK A. L. GOODMAN, C.J. – CONCURS

GINGER K. GOOCH, J. – CONCURS